CASE NO. 09-CV-5167 (SLT)(RLM)
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANNA-MARIA THOMAS *et al*,        PLAINTIFFS

against

NEW YORK CITY DEP'T OF ED, *et al.*,DEFENDANTS

PLAINTIFFS' REPLY TO DEFENSE MOTION TO DISMISS
MEMORANDUM OF LAW

JOY HOCHSTADT, P.C.

Attorney for Plaintiffs, ANNA-MARIA THOMAS et al and the putative class

300 Central Park West, Suite 2E New York, New York 10024

Tel (212) 580-9930; Fax (212) 580 9322

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

PRELIMINARY STATEMENT ........................................................... 1

FACTS OF THIS CASE PRESENTED AS MYTHSPERPETRATED ON THE PUBLIC .............. 2

   Myth #1 ................................................................... 2

   Myth #2 ................................................................... 4

   Myth #3 ................................................................... 5

   Myth #4 ................................................................... 5

   Myth # 5 .................................................................. 6

   Myth #6 ................................................................... 7

   Myth #7 ................................................................... 7

ARGUMENT ............................................................................ 9

   POINT I ................................................................... 9

THE COMPLAINT STATES SEVERAL CAUSE OF ACTION
   THAT ARE ESTABLISHED FACT ............................................... 9

   POINT II .................................................................. 11

PLAINTIFFS FIRST AMENDMENT DEPRIVATION ARE MASKED AND RETALIATED AGAINST BY
   PRETEXTUAL DISCIPLINARY CHARGES ...................................... 11

   POINT III ................................................................. 11

THE ISSUES IN THIS COMPLAINT ARE *FAR FROM* MOOT ........................... 11

a. The agreement gives the DOE virtually unlimited time to bring charges against Educators though by
   slight of hand it appears to reduce the time. ...................................... 11

b. The DOE-UFT agreement of 2010 even with all its loopholes announces may extend the time if it is not
   complied with of the first year it is in effect ........................................ 15

CONCLUSION ......................................................................... 25

## TABLE OF AUTHORITIES

### CASES

Ashcroft v. Iqbal ,129 S.Ct. 1937 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

Cleveland Bd of Ed v. Loudermill, 470 U.S. 432 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Cruz v. NYC Dep't of Ed, 2010 WL 93235 (N.Y.Sup.2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Hayes v NYC Dep't of Ed..,25 Misc.3d 1238(A), 2009 WL 4724259 (N.Y.Sup. 2009) . . . . . . . . . . . 10

Los Angeles County v. Davis, 440 U.S. 625, 631 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Matthews v Eldridge, 424 U.S. 319, 333 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Plessy v Fergusen,163 U.S. 537 (1896) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

United States v. W. T. Grant Co., 345 U.S. 629, 632 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

### STATUTES

NYS ED. L. §2568 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

NYS ED. L. §2590, §2590 j.7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *im passim*

NYS ED. L. §3020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 9, 25

NYS ED. L. §3020-a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *im passim*

### CONSTITUTIONS

United States Constitution

    Amendment I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

    Amendment XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## PRELIMINARY STATEMENT

This matter challenges the way a very specific law, NYS Ed. L. § 3020-a, which very strongly protects the due process rights of tenured public school teachers to maintain their property and liberty interests in their instructional positions, for which they are specifically certified by NYS, has been amended with regard to NYC teachers only. The amendments involve changes in how they can be brought up on disciplinary charges through the enactment of Ed. L. § 2590 j. 7, on August 13, 2006. It further involves by whom these charges may be adjudicated which was effected by amending Ed. L. §3020 in 1999, again solely for NYC and has evolved to no longer be before impartial hearing officers but before mostly long tenured hearing officers who have been housed-by, guided by, and have adopted the values of only one of the parties, *viz.* the NYC Department of Education ("DOE"); they do this in order to please the only "employer" with whom they have constant contact, and thus, for whom they perceive they work and to maintain their positions[1]. Finally the rife non-compliance with the very specific timelines mandated by the § 3020-a statute, while addressed by an Agreements .

It may appear benign that a school superintendent may prefer the charges rather than an independent body, the school board; however the protections incumbent in review by a deliberative body with a diversity of views ensures that personal vendettas against individuals, frivolous charges, pretexts and Superintendent or Chancellor initiated or encouraged policies that are contrary to fair practices that a citizenry would want of its government officials have an infinitely greater possibility of being thwarted. In the eight years of this Chancellorship, the number of teachers brought up on charges each year has increased perhaps ten-fold or more (to be more precisely determined through discovery). Yet by the Chancellors own admission only three teachers have been fired for incompetence. While he may have initially believed it would be many more as he brought what he believed were higher standards to the teaching and learning in the schools of NYC, this demonstrates that his shibboleths of "dead wood," "outmoded ideas," "in need of young, fresh faces and ideas" are incorrect and his wholesale removal of teachers from the classroom in numbers previously unheard of in NYC, and still at rates unknown in the rest of the state is detrimental to the citizens of NYC. It is highly improbable that there has been so precipitous a moral decline in the teacher-workforce of NYC, that the escalation in "misconduct" charges

---

[1] As will be discussed, though there is parity between the UFT and the DOE in initially appointing new Hearing Officers, there is a great imbalance of power in the mechanisms of removal. Thus, if balanced or neutral appearing Hearing Officers are chosen but the DOE has infinitely greater leverage in removing Hearing Officers not sufficiently DOE-leaning in their decisions and in annually renewing the Hearing Officers it favors over UFT objection, then the "permanent" panel grows more pro-DOE with time, as appears to have occurred, with the seemingly benign change to a permanent panel, albeit on annually renewable appointments called a "rotational panel." The §3020-a law as written mandates *ad hoc* American Arbitration Association ("AAA") suggested and supervised Hearing Officers which the teacher and the employer both select from a suggested AAA list of 15 potential arbitrators; it is how hearing officers are chosen in the rest of the State.

represents anything more than that serious misconduct occurs that the same minuscule rate as before, but that many trivial incidents, non-incidents, and even fabricated incidents are allowing Principals to remove teachers from their schools for a variety of improper reasons. Just as the "deadwood" turned out to be a misconception or myth, so to is who is being removed from the classroom and for what reason. Therefore, that is the way the factual background section of this memorandum is presented. It will provide the basis for how seemingly benign amendments to the law have been misused to inflict invidious constitutional violations to the property and liberty rights of NYC teachers that need to be corrected. This memorandum also shall demonstrate that the April 15, 2010 Memorandum Agreement between the DOE and the UFT is rife with misstatements, misapprehensions and deceptions specifically aimed at enlisting this Court's assistance in the continuation of the unlawful and unconstitutional arrogation of power to the Chancellor. First, over a dozen myths that arise in the first pages of Defense Memorandum that should be debunked.

Second and most significantly, this lawsuit which constitutionally challenges amendments to state law pertaining solely to NYC, was certified to the Attorney General of the State of New York, as it must be for every facial challenge to a state law. The Attorney General of the State of New York has declined to intervene in this case. Such intervention is generally undertaken on the presumption that each law enacted is constitutional and deserves defense in Court by the government. It is noteworthy that the State of New York has not sought to defend the changes made to the way tenured teachers may be disciplined in NYC which departs from the very strong endorsement of the property rights of tenured public school teachers that §3020-a affords and as it is practiced in the rest of NYS.

## FACTS OF THIS CASE PRESENTED AS MYTHS PERPETRATED ON THE PUBLIC

### Myth #1

". . . teachers, all of whom were placed in DOE reassignment centers pending Education Law §3020-a disciplinary charges against them." See April 15, 2010 Memorandum Agreement between UFT and DOE (hereafter the 2010 agreement).

There are many teachers who languish in rubber rooms without any disciplinary charges filed against them for years. Plaintiff Leevert Holmes represents that group of teachers who are left to languish in rubber rooms for years without any charges ever having been filed against them. Mr. Holmes has never been charged with anything, yet that has been his assignment for almost two years. Other teachers have been there for three years, one year, eighteen months, four years, eight years or more–and no charges have been brought against any; each

2

were sent back to the classroom or are still there.  Putative Class Member Vera Streeter spent three years at 333 Seventh Avenue one of three veteran teachers removed from Middle School 44 for absolutely no reason at all[2]. Arturo Sequiche spent five or more years in various rubber rooms without any charges ever being bought against him.  He finally got bored and retired.  Alan Rosenfeld whose name and misinformation is constantly bandied about the press as the "teacher too dangerous to allow near the children," was, in fact, allowed back in to his school after the one-week quasi-nonsuspension when no one came to testify against him and the arbitrator did not know what to do so he said let's reconvene here next week; that week was considered his suspension. However within the following year Rosenfeld had been appointed as Assistant Principal.  Apparently Klein could not deal with that the accusations against Rosenfeld were viewed as being so trivial (which they were–they are just pretexts for removing disfavored teachers) that it did not hamper Rosenfeld's advancement from teacher to Assistant Principal.  Thus, Klein ordered Rosenfeld back to the rubber room at 25 Chapel Street where he has adapted to

---

[2] One of the three, Twana Adams, was brought up on the trumped up charge of having block printed "Ms. Ortiz" on both the line for the principal's name and the line for the principal's signature while she was in pain from an injury.  Mr. Leighton, for the Defense, argued this was a "serious mistake" worth a $10,000 fine, which the hearing officer awarded despite finding that the error was inadvertent.  Petitioner argued that the very bringing of the charge was retaliatory and happenstance because the two other teachers sent to the rubber room at the same time were never charged and because the arbitrator was biased as Ms. Adams had overheard an *ex parte* discussion between her arbitrator and Theresa Europe Chief Prosecutor for DOE indicating they were going to "fix them good" or words to that effect referring to a group of teachers who brought an action; Adams contributed an affidavit as to what she heard. (Exhibit 7)  Thereafter, Adams asked that arbitrator to recuse herself.  The Court erred when it denied Adams petition on the presumption that the arbitrator had been an AAA arbitrator.  Had the AAA been involved, the arbitrator could not deny recusal on her own. She would have had to submit the matter to the AAA to determine whether recusal was appropriate.  This is the great problem with NYC making up its own rules that do not give the Teachers due process enjoyed in the rest of NYS. §3020-a mandates that the AAA provide the arbitrators and oversee the arbitrations.  Between May 1, 2008 and June 27, 2008 10 teachers who were plaintiffs in that action Teachers4Action v. Bloomberg *et al* were fired for no other reason than they were deprived of counsel at their hearings.  Without counsel there was a rush to *ex parte* judgment, they all asked for a brief stay of their hearings pending resolution of the counsel withdrawal which lasted only to the June 27, 2008 agreement (Exhibit 1) all were refused at the *ex parte* direction of Theresa Europe.  Then many asked their arbitrator to recuse themselves as Adams did.  The arbitrators all refused.  Each proceeded with *ex parte* hearings and terminated each teacher, whereas under the AAA the arbitrators had no right to unilaterally refuse to recuse themselves. Not a single teacher has prevailed in state court.  The lessons to be learned are that a single individual employed by the employer cannot be allowed to bring a tenured teacher up on disciplinary charges, it occurs nowhere else in the state –even the present administration (or the legislature or both) is not going to allow the next Chancellor the same power. The law § 2590 j. 7. expired a year ago when this Chancellor's term was supposed to be up and was extended for the current balance of the term of this Chancellor.  Also there are further deprivation of due process when a DOE employee, Theresa Europe, Esq., is allowed to manage the hearing process, rather than the AAA and tells the arbitrators they must continue with the hearings even when these 10 teachers are the only teachers in DOE history who were involuntarily deprived of assigned counsel for which each has paid $1000.00/yr in union dues, some for over 20, 30 or more years. Finally it demonstrates the dependence of the permanent arbitrators on the DOE and their income from DOE– it is highly unlikely that *this rush to judgment (a.k.a. "shooting fish in a barrel")* would have ever occurred with AAA arbitrators, working under AAA rules.  This is not "rational basis," this is intentional deprivation of the due process and equal protection rights of an important segment of society–its public school teachers.  The Defense both admits wrong doing and demonstrates arrogance when it says that it does not have to defend or justify its policies in order to demonstrate "rational basis," albeit lack of congruence or proportionality.

3

survive and thrive for the last eight years, without any pending charges, for a total with and without charges of almost a decade.  Rosenfeld has sufficient service that his pension exceeds his salary[3] and he is beginning to think of retirement.

### Myth # 2

. . . that the constitutional minimum for a security guard with a high school education having completed a six month probationary period [*cf.* <u>Cleveland Board of Education v. Loudermill</u> 470 U.S. 432 (1985)] is to be applied to an educator who has gained academic tenure after having a minimum of three years of supervised and observed successful state-certified instructional service and has earned a minimum of a Master's Degree in an appropriate discipline from an accredited institution and where during their tenure many earn further advanced degrees and achieve substantial expertise in their scholarly field.  Moreover, it is not what the legislature intended, what the legislature intended is embodied in § 3020-a, which is a very strong protection of the due process rights of tenured teachers and was meant to apply to all NYS teachers.  Furthermore the UFT was coerced into changing §3020 to make the Collective Bargaining Agreement ("CBA") supercede §3020-a by the DOE refusing to deal with class size issues or grievance procedures until after this change in §3020 was co-sponsored and enacted (*see* Exhibit 3).  The legislature passed it only temporarily without hearings only because the UFT cosponsored it.  It is doubtful that the legislature would have passed the vague amendment to the very specific due process guaranteed by 3020-a if it knew the abuses that would come to pass giving the DOE-UFT CBA *carte blanche.*  It is the mantra that appears in the affidavits of the two architects of the permanent panel, (*see* Exhibits 4-5)  and every CBA thereafter that the permanent panel is an "improved process" for UFT members as well as DOE – that makes one retort "the lady doth protest too much."   In fact, the permanent panel (called a "rotational panel" as a subterfuge) has been the single greatest source of denial of due process to NYC teachers.  Through the permanent panel there are endless waits for an assigned arbitrator leading to the need to warehouse teachers, also leading to more teachers resigning or "settling" on DOE before they ever get the arbitration, than go through the arbitration (precise data to be obtained through discovery).  There is no adherence to American Arbitration Association ("AAA") rules which leads to no stays of arbitration and no recusals even when it is clearly in the interest of justice to do so.  §3020-a calls for the joint selection of an arbitrator from a list supplied by the AAA; NYC

---

[3] The cross over point is at 40 years of service for those who began service before 1975 as the pension plan was 50% salary at 20 years of service for those who were appoints before 1975.  After the 1975 financial crisis in NYC, the new hires only received 40% salary after 20 years of service.

4

teachers get no choice, they are assigned an arbitrator; it may even be Theresa Europe who is assigning arbitrators. §3020-a requires that *ad hoc* AAA arbitrators working under AAA rules be paid at AAA rates $1200 - $1800 /day plus expenses whereas permanent arbitrators may only be paid $200/per day *i.e.,* low enough that no one would put the job above their principles (as appears to have led to the 10 teacher terminations at their hearings which took place over a very few weeks, all were forced to go through the arbitration without counsel and the arbitrators consulted no one but Theresa Europe as to the propriety of proceeding.

### Myth #3

that the "rubber rooms" are filled with teachers accused of molesting students or are themselves developing signs of cognitive decline. No teacher who molests children is in a rubber room, they are either incarcerated or at home without pay or benefits. Teachers whose functioning is in question are subject to Education Law §2568 medical and psychiatric evaluation and can be taken off payroll until they are again fit for duty or otherwise forced into a disability retirement on merely a staff-physician's signature–without delay or due process requirements. The rubber rooms are instead filled with the most accomplished teachers, prize-winners for their teaching, a higher ratio of Ed.D.'s and Ph.D.'s than in the system as a whole, curriculum innovators, accomplished scholars in their own fields–who are sent simply to get them out of the Principal's sight (or rather to get the often new and inexperienced Principal or the corrupt Principal where the teacher cannot see him or her involved in wrongdoing) and to get their high salary off the Principal's budget. The teacher's salary is assumed by the DOE central administration once the teacher is removed from the school.[4]

### Myth #4

Thus, what horrid acts are these teachers accused of, for a group with such accolades? They are accused "Putative Class-Member" ("PCM") #1 of spending too much of the lesson going over the homework; PCM #2 alternately, of spending too little time going over the homework; PCM #3 of singing "Eyes on the Prize" in commemoration of Black History Month as "warm-up" at the beginning of an Economics class; PCM #4 of "poor

---

[4] Before the Klein Chancellorship, each school was allotted a set number of teacher slots for each license type needed by the school. There was no impact on the school budget whether the teacher was at the top or bottom of the pay scale. In fact average teacher's salaries where published by school and district. There was great pride taken by schools and districts when they could attract and keep the most experienced teachers with the highest educational attainment, ergo who earned the highest salaries. Along with Klein's misconception that older teachers were "deadwood" and the encouragement that Principal's should remove whomever they pleased, went *pari passu* that teacher salaries would be allocated to school budgets in dollar amounts. This incentivized the removal or highest paid teachers where the differential in pay increment for longevity (maximum at 22 years of service) is approximately twice the differential for earning a Doctorate degree or equivalent academic attainment (two years full-time course work past the Master's degree)

5

rug management," i.e. seating second graders on the "reading corner" rug in a manner that the observer did not find optimal; Plaintiff #5 of bringing a plant to school without prior authorization; PCM #6 having a week-old "word-wall" still displayed; PCM # 7 of allowing a 10th-grade student to duck out of the room for a few seconds for a drink of water at the fountain immediately outside the door and visible from inside, without disrupting the class to ask permission or sign the "hallpass" book; PCM #8 of unintentionally block printing the word "Ms." and then block printing the five letter Principal's surname in both the box requiring Principal's name as well as the one requiring Principal's signature, rather than supplying it for the first box but omitting it, for the second.

### Myth # 5

Come on now, what did these teachers really do?  PCM #1 wrote to the Chancellor and to the Board of Regents to report that her supervisor directed teachers to grade the Math A Regents Exam with a no. 2 pencil "for subsequent review," when the packet instructions clearly specified "Red Ink or Indelible Pencil only"; PCM # 2 drafted and distributed to the 200 faculty members of her school (albeit addressed to the Principal, a nine page memorandum) outlining a comprehensive plan for improving student performance, conduct and attitudes in a poorly performing school, Plaintiff # 1 reported the threatening behavior of another teacher toward her to the police, and also expected to be promoted to the position she had been promised in order to recruit her a newly established school; Plaintiff #2 reported a student who repeatedly assaulted him to the police, PCM # 3 Reported her Principal to the Superintendent for age and race discrimination and also reported to the Principal that another teacher was engaged in a criminally inappropriate relationship with a student; Plaintiff # 4 filed grievances concerning class size and failure to grant workplace accommodations,  Plaintiff # 5 accepted the Principal's invitation to address a parent and friend fund-raising group and told them of the 25 years of change he had witnessed in the school that included the dilution of the syllabii, narrowing of the curriculum from five foreign languages being taught for four years each to solely Spanish being taught for one year, removal of music, a subject required for graduation from the curriculum, etc. and he asked for support to restore the once academic excellence, he also reported a dubious contract for windows to be replaced for the second time in five years, and diversion of the $78,000.00 annual budget earmarked for music to other purposes to the Special Commissioner of Investigations; Plaintiff #6 reported the scandalous sexual escapades going on in his school to a journalist rather than the school administration because the school administration was itself involved, PCM# 7 reported to her Principal that a social studies teacher was having a criminal sexual relationship with a senior student.  PCM #8 criticized the Principal for failure to manage decorum in the school and of black/white discrepancies between two

schools occupying the same building where the predominantly white childrens' school had a state-of-the-art computer lab, modern library facilities while the mainly black childrens' school did not, the two schools did not share any resources, the black children were not allowed to use the computer lab etc..

### Myth #6

. . .That Education Law §2590 providing for operation of NYC Schools was enacted in 1969 for all of its provisions and that the provisions that effect teacher discipline are permanent law. The sections which say who can bring charges against an educator in NYC §2590 (h) (j), the relevant portions thereof were enacted and became effective on August 13, 2006. The Board of Education was disbanded in 2002. There was no legal authority for any charges to be brought except by a School Board between 2002 and August 13, 2006. Plaintiffs Cruz and Pakter had charges brought against them by School Superintendents on June 26, 2006 for Cruz and in April 2005 for Pakter but there was no legal authority for anyone but a School Board to bring said charges. Only on August 13, 2006 with the enactment of Ed. L. § 2590 j.7. could a superintendent bring charges. Therefore, both Pakter and Cruz charges' are a nullity. Pakter should be reimbursed the $15,000.00 he was fined in 2006 with interest, and Cruz should be reinstated to her position. There are probably between 500-1000 putative class members who also received their charges between July 2, 2002 and August 13, 2006 whose charges and thus subsequent hearings were without legal authority. PCM #3/#7 Jennifer Saunders, other PCMs Deborah White, Ted Smith, Joanne Hart, Michelle Bender, Gloria Chavez, Josefina Vasquez, just to name a few out of hundreds were all brought up on disciplinary charges without any legal authority to do so and the results of those hearings should be void.

Further, a previous version of 2590 j was deemed unconstitutional and was nullified. Even the next version had a sunset provision allowing it to expire on June 30, 2009. However, when it expired on June 30, 2009, NYC Mayor Michael Bloomberg scurried, first to empanel a Board of Education while awaiting the legislature to reenact the NYC school laws that gave him control of the NYC schools which he could also delegate to the Chancellor, but which this time would expire on June 30, 2015. The new date was to coincide not with the Mayor's term of office but with the Chancellor's term of office which survives the Mayor's by two years. Thus, the arrogation of power was not meant as a permanent status, but only to over-empower the current incumbent.

### Myth #7

That Plaintiffs Pakter and Cruz are collaterally estopped from being class representatives whose goal is to demonstrate the need for declaratory relief. Their individual situations are not being claimed for damages, but

7

only as exemplars of the pitfalls of the statutes as amended to deny NYC teachers due process and equal protection. Dr. Cruz was brought up on charges for acts that her Principal and Assistant Principal not only perpetrated and admitted to, but for which she was nevertheless fired by a biased arbitrator who failed to disclose his more than 20-year employee-employer relationship with the DOE and who refused to recuse himself when requested to do so because he failed to stay the proceedings when her assigned union counsel withdrew in retaliation for her participation in the other lawsuit the Defense alludes to. Mr. Pakter is an example of a "teacher of the excellence" lauded by Mayor Rudolph Giuliani as "Teacher of the Year" 1997 at a City Hall Ceremony, who "blew the whistle" on his Principal during 2003-2004 forced her to resign for her misdoings but the entire city school district has been retaliating against him ever since. He has been assigned to rubber rooms for the past six years and though cleared of the charges for which he was last assigned, the DOE has brought new charges pertaining to what they call attendance issues in the TRC and we call constructive termination. The Defendants, most notably Defendant Judith Rivera withheld over $170,000.00 of his pay for his inability to tolerate more of the rubber room after five years confined there. Ironically Defendant Rivera has recently been fired because she came to her workplace extremely rarely and withheld numerous already issued paychecks of Mr. Pakter's for the same conduct –at least he had an excuse –the conditions of the rubber rooms are so intolerable that there are only a handful of teachers who have actual been able to attend on a regular basis after more than 2-3 years of confinement.

The changes that this one City Administration has made to the practice and laws that affect teacher tenure are so sweeping as to make tenure meaningless. It is obvious that this Chancellor has an agenda. To purge the system of what he considers "old ideas,"[5] "antiquated methods" and fill it with "fresh faces," "young ideas," "young Principals." Chancellor Klein set up a "Leadership Academy" in which he nurtured professionals for a year, often from fields other than teaching and education. He believed that running the schools of the City of NY should be like a business. The Principals he installed were largely under 40 years of age and he instructed them to remove from the schools as many teachers that they wished. The removed teachers' salaries would be

---

[5] The quotes from the Chancellor are so numerous whether they come from before the Panel on Educational Policy ("PEP"), the Budget Committee of the NYS Legislature, Charley Rose interview on PBS or wherever; the reader is referred to "Google" "Joel Klein" and (any one of the) shibboleths being attributed to him for numerous instances of where his "housecleaning" philosophy of promoting young leaders and giving then a free hand is espoused. Principals are encouraged to purge their ranks of teachers not favored. However, with the new inexperienced, young principals there was discomfort with the veteran teachers who knew more than they did. It was the Ed.D.'s and Ph.D.'s who were sent to the rubber rooms, the veterans with spark and ideas, and the most intelligent teachers who were a threat, while the docile and submissive pedagogue no matter how unskilled were and are better tolerated.

immediately transferred out of their budget which they could then use to hire lower paid teachers with fewer years in the systems and fewer differentials for greater educational attainments and most of all without tenure..

The Chancellor has actually encouraged the unsatisfactory rating of teachers by Principals in order to expedite the turnover of the instructional workforce.

## POINT I

## THE COMPLAINT STATES SEVERAL CAUSE OF ACTION THAT ARE ESTABLISHED FACT

The Plaintiff and the Court in its guidance to the parties indicated that this is a case about the law, changes in the law and the impact on the putative class.  Plaintiffs were guided by the Court that specific ramifications that might injure some class members in a manner different from others, were not what the Court planned to focus. Thus, Plaintiff Pakter's paychecks being withheld while a very real injury to him was more appropriately claimed in an individual complaint, while the fact that he represents a subset of the putative class which has been reassigned for six years or more for having exercised first amendment rights to address important issues of public concern that had nothing to do with his duties as a teacher (for which he was always one of the most lauded teachers in the City), and successively brought up on multiple sets of charges to keep him from :"whistle - blowing" again[6].

The causes of action are not only "plausible" they are factual.  The 3020 law was changed at the behest of the Defendants; in fact DOE would not consider class size adjustments and grievances until the UFT agreed to cosponsor the change to 3020 to make the CBA supercede 3020-a.  The CBA has since that time included a permanent panel of arbitrators which has led to long delays and non-compliant backlogs in violation of law and CBA which Defendants admit to but cavalierly assert have all been made moot by the April 15, agreement which we herein argue is not only totally implausible is totally impossible.  It is a fact that the Hearing Officer panel is not selected, supervised, or operated according to the rules of the AAA.  It is fact that if it operated pursuant to AAA rules, arbitrators would have had to brought any requests for recusal to the AAA.  The compulsory *ex parte* pursuit of terminating teachers led to the termination of ten or more putative class member who were made to

---

[6] There should be no collateral estoppel for either David Pakter or Josefina Cruz; both merely are representatives of the putative plaintiff class and exhibit circumstances common to a specific subset of the putative class.  Neither make claims for damages in this action.  Pakter's prior action was dismissed because the Court deemed it time-barred. This Court on the other hand needs to be aware that there are teachers who have been confined to "rubber rooms" for 6-10 years.  Dr. Cruz however, while also makes no claims for herself for damages in this action, is a member of the subset of teachers who became severely physically and emotionally impaired due to unsafe and unhealthy conditions in the rubber room and also was compelled to undergo arbitration that began after her assigned attorney was instructed to withdraw for retaliatory reasons.

undergo hearings without counsel as the UFT and NYSUT withdrew assigned counsel from 61 putative class members were deprived of counsel *cf.* Hayes v NYC Dep't of Ed..,25 Misc.3d 1238(A), 2009 WL 4724259 (N.Y.Sup. 2009); Cruz v. NYC Dep't of Ed, 2010 WL 93235 (N.Y.Sup.2010). It is a fact that §2590 j.7 was enacted and became effective on Aug 13, 2006. It is a fact that §3020-a requires the School Board to prefer charges against a teacher. It is an established fact that the NYC Board of Education was dissolved on July2, 2002. There was no legal authority to bring charges against any teacher from July 3, 2002 until August 13, 2006. Plaintiffs Cruz and Pakter, and perhaps 30% of the putative plaintiff class had charges preferred against them in that time period for which there was no legal authority to bring charges against any teacher in NYC. Pakter was fined $15,000; Cruz lost her job. Numerous others also lost property and liberty (their NYC licenses were revoked so that they may never practice their profession in NYC again. The fact that hundreds of NYC teachers where injured by being deprived of their property rights in their tenured public employment, worth millions of dollars over the course of their life, without anyone having the legal right to do so, is a very serious cause of action which needs to be redressed. Even arguendo, if the DOE was to be able to implement the changes that the April 15, 2010 Agreement says it shall, the Agreement does not abrogate past harms. Even if the next 1500 or more teachers brought up on charges are not confined to rubber rooms, are allowed to practice their profession, and are not demoted to ATR's, some 1500 plaintiffs in the putative class were subjected to these admitted injustices that the DOE says it wishes to end. The putative class seeks damages and redress for those injustices and especially those who were brought up on charges when there was absolutely no legal authority to do so. Instances of Arbitrator corruption, e.g. taking orders from Theresa Europe (Martin Scheinman in Michael Ebewo's first 3020-a)., cutting off cross-examination just when the Principal Jerard Resnick began to make admissions against interest and moving on to redirect (Eric Lawson in Jennifer Saunders 3020-a); excoriating the teacher for having joined Teachers4Action and then refusing to recuse herself (Andree McKissick in Twana Adams 3020-a Exhibit 7) all give rise to additional causes of action. Many teachers wait more than three years for an administrative hearing to begin, most wait over two years. This is not "at a reasonable time, in a reasonable manner." See Matthews v Eldridge, 424 U.S. 319, 333 (1976). These claims under the First and Fourteenth Amendments invoked via 42 USC 1983, not only meet the plausibility standard they are already established and admitted fact. See, Ashcroft v. Iqbal ,129 S.Ct. 1937 (2009). This represents an additional claim of denial of due process. Mr. Leighton's boiler plate claim, that the complaint does not meet the required pleading standard, does not exemplify his best legal analysis.

10

## POINT II

## PLAINTIFFS FIRST AMENDMENT DEPRIVATION ARE MASKED AND RETALIATED AGAINST BY PRETEXTUAL DISCIPLINARY CHARGES

Again, the specifics of what occurred to individual putative class members and plaintiffs in retaliation for their "whistle-blowing" is more specific than the Court is guiding the parties to consider; nevertheless the class claim of 1st amendment retaliation is one other of the core claims of the entire putative class exemplifying constitutional claims of the unlawful chilling of protected speech. Myths #4 and #5 document the protected speech and the retaliatory pretexts that ensued for a number of Plaintiffs/Class Representatives. Plaintiffs herein respectfully requests leave of the Court to move to supplement the complaint with the names of exemplar plaintiffs and class members, the protected speech (important matters of public interest not involving their own work assignment or duties) they engaged in the retaliative removal from their assignment, the pretext used to cover-up.

## POINT III

## THE ISSUES IN THIS COMPLAINT ARE *FAR FROM* MOOT

### a. The agreement gives the DOE virtually unlimited time to bring charges against Educators though by slight of hand it appears to reduce the time.

The Defense itself cites, ". . .as a general rule voluntary cessation of the allegedly illegal conduct foes not deprive the tribunal of power to hear and decide the case, *i.e.,* does not make the case moot." *See,* Los Angeles County v. Davis, 440 U.S. 625, 631 (1979) *citing* United States v. W. T. Grant Co., 345 U.S. 629, 632 (1953). In this particular matter, it is essential that the Court maintain jurisdiction both to ensure compliance with the some of the issues that the Defense has announced it will comply with, and because the most egregious offences are either not covered by any agreement or as will be shown are in the agreement but are impossible to implement..

It should be noted that many of the issues covered by the agreement are merely agreement to comply with existing law that should have been complied with all along. For example, in the letter agreement referred to in the second sentence paragraph one of the agreement Exhibit B and Exhibit 1 cover the same ground. The 2008 letter assures that the charges will be brought within 160 days, the 2010 agreement states they will be brought within 60 days "except where the reassignment or suspension is caused by an allegation of sexual misconduct . . . , an allegation of serious financial misconduct involving more than $1000 . . . or criminal charges pending against the employee . . ." and about five other broad categories (see Defense Exhibit B, page 2 lines 12-19) that account for almost all of the categories for which teachers are investigated but not necessarily brought up on charges if the allegation cannot be substantiated. Even teachers brought up on charges for incompetence, when ever possible

11

have some sort of a misconduct charge added. Upon discovery in this case we shall see how many teachers are brought up on solely incompetence charges. For all these categories of charges they used to give themselves 180 days, after which the teacher could demand charges be brought immediately or the teacher be sent back to their regular assignment. DOE has given themselves a bigger loophole than ever, because they would not comply with either pre-2008 terms of 180 days, nor the 2008 terms of 160 days, the agreement makes no promises as to how long it will be allowed to take to investigate these serious charges.

It would also mean that three of the named plaintiffs out of five to six[7] would still have had no limits on the length of the confinement before charges were brought. Ms. Thomas was completely exonerated of sexual misconduct charges alleged by several students who were of the belief they should pass her class merely for showing up to class. When this did not occur they alleged (in explicit detail) that she taught them in Health Class that all their bodily fluids were balms. elixirs and other remedies for all that ailed them and should be anointed liberally as a cure-all. Of course the Principal intentionally interviewed them as a group as did the Office of Special Investigation ("OSI"), so they concurred with each others statements, while at the hearing months later and one at a time under coss-examination their stories fell apart, were inconsistent and implausible.

Yet Ms. Thomas spent 16 months in the rubber room at 25 Chapel Street and for those 16 months developed health issues that required surgery, suffered enormously in the hostile work environment of confinement there and returned to a different hostile work environment where merely having been accused and sent to a reassignment center for so lengthy a period made her a pariah at her home school.

Mr. Pakter was brought up on (later testified to be) perjured and fabricated charges of tardiness in 2005.[8]

---

[7] Plaintiffs had no knowledge nor could have any, of an agreement that was suddenly announced on April 15, 2010, yet purely by chance 3 out of 5 who have been bought up on charges would have been exempt from the time limits –Mr. Holmes has been confined to rubber rooms, and in fact the trailers (see Hochstadt Declaration and Plaintiff's Exhibit 2) 18 months and has not been brought up on charges as there are really no charges to bring him up on but his Principal does not want him in her school because he made a police report pursuant to a student seriously assaulting him. Sometimes Principals' own service does not survive the preparation and serving of the charges; and the teacher just languishes in the rubber room for years.

[8]

That arbitrator Martin Schulman agreed to drop in an "off the record" sidebar [the "rotational panel" does all sidebars off the record at the DOE insistence, (occasionally, the rare times that a private attorney, is hired that attorney will insist sidebars be on the record.–despite DOE opposition). Arbitrator Schulman's initial decision was based on the Testimony of Larry Taylor, UFT Representative, that at least ½ the faculty came in at the same time as Pakter did or later. However after the sidebar, something caused the arbitrator to change his mind. Pakter was fined $15,000.00 and told to report to a different school where the administrators framed him (proven by several sworn sources at subsequent 3020-a) and had him removed again 19 days later allegedly because of sexual misconduct. But the student whom the Principal got to say she had seen a photo on her friend's cellophane of Mr. Pakter unclothed, was making it up as the friend she directed investigators to never had a camera cell phone. Thus, when the charges were brought they only included ludicrous accusations the he had brought a plant to school without authorization, that he had offered watches (he had designed) to

12

When this did not terminate him he was 19 days later removed from the school to which he was sent; supposedly because of inappropriate images of himself that a student alleged she had seen on a friend's cell phone– and though that allegation was bogus, but because he was removed from the school ostensibly on this type of allegation according to the new agreement he could still be awaiting charges four years later.   At least now he can retire knowing that charges made at the last school were all dismissed.

Plaintiff. Salazar was also brought up on charges of an inappropriate relationship with a student that amounted to nothing more than some students who had earned a failing grade in his math class deciding to report that they had seen Mr. Salazar in a Diner with a female student in the class.   The two were merely talking on the take out line, each waiting for their separate take-out order, had not come in together, and the diner was across the street form the school and where all faculty and students including the boys who had failed the class went to purchase food.   Since they phoned the hotline directly to Richard Condon (Special Commissioner of Investigation for the Department of Education) the first thing the investigators did was to subpoenae the telephone records of Salazar and the female student to find that she was calling him several times a week and he was calling her at least once a week or more.

What the investigators failed to do was to make the same analysis of phone records with at least 10 other

---

students making the honor roll (which he had done for 35 years), and that he gave a gift of a watch to a school aide (perfectly encouraged conduct as long as not on the same line of authority which they were not)–all these latter charges from that school four years ago were dismissed so the Department invented some new ones–after being assigned to rubber rooms since 2004 by 2008 or 2009 he could no longer tolerate the conditions, the confinement, the concept of punishment before trial and rarely came to the rubber room.   The first year he was docked more than $78,000.00 although the second year he received his checks because his payroll secretary testified that she saw in her computer that he was on "leave with pay"–which everyone believed was because his pension had surpassed his salary and the only reason preventing his retiring was clearing his good name.   As soon as Defendant Judith Rivera learned he was now being paid  she ordered that the already issued paychecks be withheld from Pakter and sequestered in a drawer, unbeknownst to central payroll which then reported to the IRS that he had earned his full salary until December 1, 2009–only then did she begin to reduce his salary without any authorization to do so.   Defendant Rivera was fired or its equivalent in June 2010 for these and other payroll checks she withheld and the poetic justice of herself rarely making the commute from her home in East Stroudsburg, Monroe County, PA or for testifying that the rubber room population had expanded so many-fold during her tenure as Human Resources Deputy Director that it overwhelmed her, that the rubber rooms were crowded and she did not know where to put people and had no choice but to assign them where she could outside their school district. She knowingly violated Chancellor's Regulation C-770 and she was aware that she had the duty to assign them work commensurate with their profession and their license, but that she had only a handful of jobs to offer fewer than 5% of the reassigned personnel; she gave the jobs to those who sought her out to volunteer and she did not even have enough for all the volunteers.   However, sequestered over 100 miles away almost all of the time, she was buffered from the reassigned teachers who referred to her as the "phantom administrator."   She left two HR Assistants Donna Dennis and Ester Antinez, two clerical level assistants, who were told or interpreted the role that befell to them, as to be as harassing and pejorative as possible to the teachers removed from schools for wrong doing.   Dennis and Antinez were  unaware that most removals were pretexts for people who loyally wished to report or improve their school, and was often preemptive and initiated by an administrator who felt said teachers might put the students, or the system or the school above loyalty to the Principal and report his/her mismanagement or malfeasance.

13

of Plaintiff. Salazar's math students. Such an investigation would have demonstrated that Mr. Salazar made himself available to all his students for help to comprehend and keep up with the math being taught. That about 1/4 of his 170 students called for help at least once and that a small group was always calling for help with the homework, before tests or when new concepts or manipulations were introduced. Thus, this particular student called and was called no more than four or five of the most frequent callers. And that the pattern of their calls were often clustered that there were specific days that many students called on and there were other days on which no one called. That on the days that there were many calls that was when the infrequent callers called at all and that might be when the student in question might call twice, consistent with Salazar's explanation that she struggled with the material but was highly motivated to master it and do well and he was eager to assist a struggling but well motivated student to master the material.

Often these logical explanations could be identified early if the investigations were truly meant to develop exculpatory evidence as much as they are to substantiate the allegation they were sent to investigate. But they are not. They are aimed at substantiating the allegation. Very often when the allegation is technically substantiated in that calls were made, papers were submitted, the teacher left the classroom briefly, the teacher did have to intervene when one student appeared to be seriously injuring another, etc. the innocent explanation is far more plausible than any nefarious one[9]. Often, the investigator's notes reflect that there appear to be no misconduct though said incident seems to have taken place. In such case, Deputy Commissioner Regina Loughren will write the report and state that the allegation is substantiated and the teacher should be terminated.

Then SCI will send another investigator to testify at the 3020-a who will testify that s/he went along as co-investigator, that the "primary" investigator asked all the questions and drew all the inferences, that the report was written from the primary investigator's notes by the Deputy Commissioner. The testimony would rely solely on the fact that the witness had been present, observed who was interviewed etc., had an independent record of the dates, times, and addresses to authenticate the report, and that it was drafted by the Deputy Commissioner. The arbitrators then take the written report authenticated by the "secondary" investigator as dispositive and make

---

[9] Mr. Salazar's life situation at the time, also made the allegation implausible as well. Mr. Salazar was engaged to be married when the incident was alleged and was married a few months after arriving in the reassignment center. His wife was a third year medical student at SUNY Downstate Medical School, has since graduated in June 2009, giving birth to their first child shortly after earning her M.D. degree. They are a close-knit extended family whereby Mr. Salazar's older brother immigrated to the U.S. in 2006 lives with his own wife and three daughters in the second floor-through flat in the home Mr. Salazar purchased before his bother arrived. The younger Salazars would spend their weekends taking their, new to the US, three nieces ice skating, or to the zoo, or other family activities before the birth of their own child.

findings the way Loughren presented the facts in her report.   That report becomes the "findings of fact" which the arbitrators report and which the state court, in its limited review, upholds as the post-deprivation review.

When Plaintiff Salazar met his assigned counsel, New York State United Teachers ("NYSUT") (the State Union as opposed to UFT the city union/local), Associate Counsel Steven Friedman and asked about Arbitrator Eleanor I. Glanstein, the assigned Arbitrator, Mr. Friedman, candidly announced "she fires everyone the DOE wants fired" and that is almost all of the cases she is assigned.   The DOE had asked for Mr. Salazar's termination.  Mr. Friedman advised that if Mr. Salazar wanted to preserve his ability to teach in the U.S. public schools of any state, that Salazar should resign.  What he would receive is a neutral letter of recommendation (dates, subjects and schools taught-in, only), the charges would be withdrawn; he would thereafter be able to obtain work outside of NYC but would remain on the DOE's ineligible list, thwarting any application to the NYC Schools.  He might also be able to resign effective June 30, 2008 so as to have all his summer pay and continue to report to the reassignment center until the end of the term which was perhaps 90 days away at the time and probably 60 days away when all the papers were fully executed.  That is what Mr. Salazar did and the school system lost one of the most dedicated young math teachers it had.

Thus, Pakter the Art Teacher who had been honored by Mayor Rudolph Giuliani as "Teacher of the Year" in 1997, but targeted in 2003, removed from the classroom and school in 2004 for reporting Principal misconduct (for which the Principal was forced to immediately resign on September 25, 2004 – but as her last act removed Pakter to a rubber room).   The entire DOE wanted Pakter out because they feared that he would report whatever administrators he worked with.  Defendant Judith Rivera quickly sent him to the 25 Chapel Street TRC in Brooklyn in 2004 and then to the West 125th Street TRC, in 2006, lest he find out where she lived and how often she came to work at 333 Seventh Avenue and report her to SCI five years earlier than he did.  Both were non-permissible assignments per Chancellor's regulation C-770.  Exhibit 6.

**b. The DOE-UFT agreement of 2010 even with all its loopholes announces may extend the time if it is not complied with the first year it is in effect**

Page 2 of the April 15, 2010 agreement does not define the difference between reassignment and suspension with pay.  The way it worked in prior years was that the teacher was told or handed a letter to report thereafter to a reassignment center.  After some time at the reassignment center, about 10 days before the specifications of precisely what the educator is being charged with arrived, the educator [usually a teacher, because the Assistant Principals number only about 5% the number of teachers, and Principals have relinquished their tenure for higher pay (knowing that any pedagogue can be brought up on pretextual charges –they do it to the teachers and

15

A.P.'s themselves, thus the Superintendents can just as easily do it to them so why not take the salary differential which is substantial—therefore one rarely saw a Principal in a rubber room in the past four years.)] receives a letter from Ms. Europe explaining that the teacher is being suspended with pay and that they are continue to report to the reassignment center, that they are being suspended based on inefficient or incompetent service, neglect of duty, conduct unbecoming a professional, criminal behavior, gross misconduct, etc (in various combinations as many as can be justified). About two weeks later the specifications arrive detailing the precise behavior, dates, time, places and manner in which the misconduct or unacceptable service occurred. On exceptionally rare occasions an educator would be suspended at home at the discretion of the DOE, usually for volatile or threatening behavior at the TRC. Therefore, there is no commitment in the 2010 agreement as to where those "suspended with pay" would report.[10]

Furthermore, the ***Timeframe for Hearings*** section of the 2010 agreement is not something new, it is equally admonished in the §3020-a law itself, in the invitation to each arbitrator to preside over a particular case (see Exhibit 8), in the CBA (for all of the CBA's over the last decade) and in both the April 15, 2010 agreement and in the June 27, 2008 agreement. Saying it again does not make it so. The single reason for the long delays are the backlog of pending cases assigned to each arbitrator. Adding a few more or many more arbitrators is not going to change the situation, that is unless DOE and UFT plan to decide to add several hundred arbitrators along with several hundred new prosecuting DOE attorneys and several hundred defending NYSUT attorneys. It is the number

---

[10] There are many who believe that the Chancellor actually had in mind (and there are numerous reports and documents to that support his announced plan) to have a massive layoff of 4000-6000 teachers for this 2010-2011 year. He further announced that it was not going to be a reverse seniority lay off by license (i.e. French teachers could not be equated with Kindergarten Teachers–each license would assessed as to exigency need vs. workforce and the excess would be laid off). The CBA calls for a reverse seniority reduction in force ("RIF") by license. The Chancellor planned to lay off all teachers who had been rated "unsatisfactory" which included all reassigned teachers, all teachers receiving a "U" rating for the first time and all Absent Teacher Reserves ("ATR") including all tenured teachers who had undergone a §3020-a process which resulted in a penalty less than termination; all tenured teachers who had lost their jobs through school closings and were not chosen for the reorganized school, all tenured teachers who had been excessed for other reasons e.g. demographics or curriculum changes at their school. Before 2005, the excessed teachers would be placed in vacancies in their district or they would seek seniority transfers to openings throughout the city. Since 2005, there are no seniority transfers and displaced tenured teachers must apply and vie for vacant slots as if they were new to the DOE. They may go out to interviews and be selected by a Principal or remain as an ATR. Those with high salaries, or who have more experience than the new young Principal, or simply looked older, were rarely chosen. It was the Chancellor's plan to lay off all these categories teachers and "purge" the system of the aggregate of almost 3000 teachers or more in this manner. It is highly unlikely that the Chancellor would ever recall them –already ATR's are by-passed and teachers from the outside are hired in their stead. Therefore, given the bad press about "rubber rooms" the April 15, 2010 "agreement" was intended as a ruse–get the credit for closing the hated rubber rooms but not to worry where to place the teachers in the Fall – the plan was to lay them off. The Mayor, or the Legislature or whomever put the Kibosh on that plan–it would have been such a bad faith violation of the CBA and disregard of tenure that now the Chancellor has the problem or where indeed, is he going to place 700-800 teachers that he does not want, previously warehoused and signed an agreement that it will be impossible to comply with for reasons to be explained in the text. The agreement, besides aimed at obtaining "good press" was for the purpose of derailing this lawsuit, lest all the concomitant lawless action of which the rubber rooms are only one symptom be exposed.

of cases that are brought many or most on frivolous charges or fabricated charges, just to get rid of teachers not favored by their supervisors for a myriad of reasons that is problematic.  If enough charges are piled on, something is bound to be found for the DOE.  Even one slight accusation that is found for the DOE and the teacher is made into an ATR which the Chancellor wants to give no more than one to two years to find a job on the open market within the system or to terminate.  The entire idea is, if no one will vote away tenure for existing teachers now, to make tenure so tenuous i.e. anyone can be brought up on charges anyone can be turned into an ATR, that soon tenure has become sufficiently meaningless that for a significant salary increment of 25%, or so,. the teachers will abandon tenure, especially when the Chancellor has, through the means now in place, gained a majority of the teacher-workforce as untenured.  This is what he did with the Principals: gave power and money in return for tenure.

The Agreement is now putting the onus on the Hearing Officer to get through the hearing within a 60 day timeline wherever possible and it states on p. 5 that the hearing officer can be removed during the one year renewable term for cause.  In practice, however if the DOE likes a hearing officer (i.e. they fire a sufficient proportion of the teachers whose cases come before them) then they are renewed forever.  If the UFT does not like a particular hearing officer, DOE will offer some incentive for the UFT to allow that hearing officer to remain.  Several years ago the UFT wanted to remove Eleanor I. Glanstein from the panel because she fired everyone that the DOE asked to be terminated.  The DOE offered UFT an extra seat, that DOE would give up, on the Collective Bargaining Committee for as long a Glanstein remained on the panel.  So it is some seven years later, or more, and Glanstein goes on firing people and the UFT is happy that it has the edge on some close vote that may be important once every three to four years when a new contract is being forged.

On the other hand when the DOE wants to get rid of a fair independent arbitrator who cannot be compromised for a paycheck, as they did with Douglas J. Bantle, they told the UFT he would not be renewed to the panel after his first year of service, the UFT could likewise select an arbitrator (other than Glanstein) that they wished to remove.  The UFT selected Dr. Andree McKissick.  Both Hearing Officers were thanked for their service and told their services would not be needed for the following year.

In this way, the DOE is making sure that it retains harsh arbitrators and that it does not renew fairminded independent arbitrators, it has collected a complement of 23 arbitrators that it trusts to want to keep their jobs or to believe that teachers do not deserve tenure in the sense that it is meant for faculty in higher education but only

what Mr. Leighton calls a constitutional minimum that a security guard has when he is a public employee for longer than a brief probationary period. See Cleveland Bd of Ed v. Loudermill, 470 U.S. 432 (1985).

The purpose of academic tenure is to ensure that ideas and criticism are not chilled by the administrative point of view. The real reasons some of the teachers in this case were disciplined were for the precise reasons that there is tenure. They were fired or suspended or fined for the reasons enumerated in "Myth #5" at the beginning of this memorandum. Since those reasons would not be acceptable to the public, the balance of the teacher-workforce, the arbitrators or the legislature, in each case pretextual often inane reasons are given. Lack of substance in the allegations is often compensated for by the number of charges or specifications brought against the teacher. Letters to file for everything and anything are used to make a record. The conduct complained about in the letters is often conduct that is exhibited by all or many teachers in the same school who do not get written up because they are not targeted. Then there are observations. A tenured teacher need only be observed teaching a class once or twice a year. However, if the observer decides what s/he has observed is unsatisfactory, the observations can be made *ad libitum* to harass the teacher, under the guise of remediation. The observation reports are subjective narratives so that a favored teacher's report only cites the elements and observations that the observer wants to commend and is silent on other observations while the disfavored teacher's report cites only negative observations most notably when a student did not comply with an instruction, or failed to hand-in a paper or spoke out of turn. The favored teacher had the same or greater frequency of students whispering, or calling out, or doodling, but this is not in the report. The report describes the didactic material how is was presented *inter alia* while for the disfavored teacher there is not even an objective recitation of the lesson content devoid of what was wrong with each element of the lesson. Yet it is these letters and these observation reports that the DOE attorneys craft into allegations of incompetence and wrongdoing. It is hyperbole on hyperbole. In one instance the specification written by the DOE attorney was that the teacher failed to model the behavior to be elicited from the students for them. When the administrator who had authored the report was cross-examined by the NYSUT counsel as to how the teacher failed to comply–it was clear that the administrator did not know what modeling was in this context. Therefore, anything the report is silent about for a targeted teacher which is anything pedagogical rather than student comportment is cited by DOE as an omission. Then the arbitrator must listen to witness after witness which the DOE prepares and puts forward stating all the things they failed to note (looking at a several year old report that was meant to disparage unfairly the work of the teacher *ab initio* before the observer even entered the classroom).

It is not unusual for the DOE to present a multitude of witnesses against the teacher, and despite adequate cross-examination some of it is bound to stick for an arbitrator interested in keeping the DOE job.  The teacher often cannot get other teachers to testify for fear of retaliation.  If they are lucky enough to have someone who recently retired or transferred, then the cross-examination is going to be brutal asking the colleague, "Did you sit in on *this* observation, if not how can you tell . . . ."

The April 15, 2010 agreement will be very difficult to comply with time lines as long as so many more proceedings are needed to keep up with the pace at which the Chancellor wants teachers charged with incompetence and misconduct for non-consequential criticisms.  There have been no charges that the teacher did not know his or her subject.  Instead the entire evaluation is a subjective commentary on class discipline and ritual behavior.  The ritual behavior includes there must be an "Aim" written on the board.  There must be a "Do Now" or warm up activity that is five minutes but cannot be 6-7 minutes and must motivate the lesson.  There must be modeling of tasks to be taught that day. There must be homework everyday that is collected, gone over in class, and it must reinforce the lesson given the day before.  Students must have a written assignment and the teacher must circulate among the students to check that they are all on task.  There must be an "assessment" of what has been learned in that lesson that day. There must be "bell to bell" teaching.  There must be a written "lesson plan" in view even for a teacher for whom this is the fifth time that day alone teaching the identical lesson (not to speak of decades of similar days) –the emphasis is all on form and not at all on the substance of what concepts to teach, in what context to place the information, how to relate it to other areas of the intellect.

Given that this is what is emphasized it takes a great deal of time to adequately assassinate the character of the teacher by witness after witness complaining about minutia.  And it takes equally long for the teacher to defend against the barrage.  The typical charge that includes some pedagogy will have 12 or more specifications and the average hearing will require at least one session/day for each specification, opening and closing arguments, and a pre-hearing to deal with discovery issues.  Therefore the average 3020-a proceeding involving pedagogy at all, requires about 15 sessions.  The prior practice was that arbitrators worked 5 days a month and five hours a day.  According to the April 15, 2010 agreement the incompetence arbitrators agree to work seven days a month, and six hours a day ("consecutive days" has meant 5 days over two weeks of the month).  Then typically the transcripts from the hearings are ordered for review to prepare closing arguments.  In the time table pursuant to the April 15,

19

2010 agreement an extra thirty days must be allotted for awaiting the transcripts[11] While the 60 days have been mandated by law, by the agreement, etc. at 7 hearing days per month, only the average hearings will be completed (albeit without awaiting the transcript) in the time frame; more specifications will take longer.

What does the Chancellor plan to do? Will he limit the witnesses that can be presented by either side? The prosecutors will argue they need that long to attack the credibility of the teachers. The teachers will argue no due process to confront the witnesses or present a defense.

On page 6 of the agreement a new mechanism of compulsory expedited arbitration is introduced, while the penalty may not be more than $8300.00 or equivalent, this amount of fine to someone who believes they are totally innocent and that they instead should receive damages for false reassignment, false confinement to wherever and false prosecution, are going to be very frustrated that their due process to a full evidentiary hearing is being denied. Also more important that the fine or the hearing are the settlement terms and the relegation to becoming a ATR whom the Chancellor has repeatedly said should be fired after a year if they have not found their own job within the system. The settlement route is often the worst. The teacher often agrees 1) to admit wrongdoing, 2) to terms that they cannot possibly comply with and they agree to automatic termination if they cannot comply despite a good faith effort to comply, 3) to become an ATR instead of being returned to a regular assignment. Thus, a teacher with a long commute was pressured into a settlement including automatic termination if her aggregate tardiness in any one year exceeded 50 minutes. She was terminated without any due process the next year. An absolutely fantastic teacher, who happened to be a recovering alcoholic and did not believe she would ever have a relapse even briefly, agreed that if she ever seen to be impaired she would be automatically terminated. She was not even in school or with students, she was at an in-service workshop shortly after her father had died. She was automatically terminated without any consideration of the circumstances;–the system lost a truly outstanding teacher. An Assistant Principal who had recently developed a neurological/orthopedic painful condition as a sequella to a line-of-duty-injury that occurred in the school yard, has had a difficult several years since the injury. She was brought up on 3020-a disciplinary charges solely for excess medically documented absences. She was being pressured to pay a sizeable fine and to agree that she would not be absent in excess of 10 days per year or she would be automatically terminated. She sought legal help beyond the Council of Supervisors and Administrators ("CSA"), her union.

---

[11] Not having allotted this time demonstrates that the agreement was written either by persons who never participated in a 3020-a proceeding or the agreement was written for some purpose other than sincerely reforming and expediting the process.

20

As to the number of hearing officers, the agreement calls for 14 incompetence hearing officers, 25 misconduct hearing officers and an unspecified number of probable cause[12] hearing officers and expedited hearing officers. The June 27, 2008 Agreement called for an expansion of the number of hearing officers from 20 to 28. Two years have passed and the number of arbitrators has only reached 23 as per the last report at the time of the April 15, 2010 agreement. If the DOE and the UFT could only agree on 23 arbitrators (after the DOE was very eager to discontinue Douglas Bantle and the UFT chose Andree McKissick to discontinue in tandem) and never reached 28. Is it reasonable to expect that between now and September 13, 2010, when the Fall term begins, they will have added 16 arbitrators, when they have been able to agree only on a net increase of 3-4 in two years?

Furthermore, Mr. Leighton suggests the number of teachers that are reassigned are 700. It is probably 10% higher but the others are reassigned solely because of pending criminal charges having nothing to do with school or their jobs. Some are silly like the Henry Louis Gates incident between an assertive citizen and an authoritarian cop. Some are just unfortunate such as the parent who leaves the child or the dog in the locked car just long enough to get change for the meter. Some are procedural as when someone is accosted by an assailant and is seen defending himself, the practice is that both parties to a fight are arrested.

Both with arrests and with false 3020-a charges sometimes the adage "offense is the best defense." Sometimes students who have gotten in trouble with a teacher try to create a distraction by accusing the teacher of wrongdoing. A student who wanted to avoid discipline when the teacher said she planned to call his father to discuss his behavior in class, reached the father after the son had reported to the father that the teacher had called him the "N" word. The father was irate and reported the teacher. The teacher was sent to the rubber room for nine months before being returned to her duties without charges ever being filed.

The April 15, 2010 agreement calls for the Arbitrator to submit the decision within 30 days. Eleanor Glanstein has a way of doing this that finesses the time requirements. She awaits the transcript of the closing arguments; it takes a month if like the other transcripts. She studies her notes, reviews the transcript, meticulously does her research and drafts her decision which can be 85 pages or more. Then she opens a hearing (or at least notes in the decision that she has), with just herself present to consider the closing arguments. She then submits her

---

[12] A brief inquisition to determine whether there is probable cause of "serious misconduct" sufficient to remove the teacher from the payroll while awaiting the 3020-a hearings for up to 90 days before the April 15, 2010 agreement and indefinitely pursuant to the April 15, 2010, for certain categories of allegations.

report within 30 days.[13]  The proscription on having the hearing go on for nine months, when 60 days should be the limit, is taken less seriously by her than the 30 day requirement to write the report (she can blame the former on the opposing attorneys, while only she can be held responsible for preparing her decision).  Except for the fact that she failed to even mention the presence much less the testimony of eight Defense witnesses or to allow two who had worked with the teacher before the teacher came to be supervised by the Principal who brought the charges her and that she credited a CSI report based on a totally flawed and inadequate investigation the report was well-written.

The plan to expedite the teacher hearings so that they could be all completed by December 31, 2010, is equally not well thought out and unrealistic.  If there are 700 teachers awaiting hearings and even suppose by some miraculous process (that is a total departure from the rate at which DOE and UFT have been able to add new arbitrators in the past, they do have 40 arbitrators in place by September 13), and teachers are called to hearings immediately, then how many hearings will the forty arbitrators be able to hear.?

If these arbitrators working seven rather than five day a month (and that is only for the incompetence arbitrators, the misconduct arbitrators with continue to work five days per month) but all would work six rather than five hours per day, each would hear a case every 60 days as proposed, then the prehearings will be held by September 15, the discovery demands will have led to document production and the hearings can begin on October 1, and conclude on November 30, 2010 and the Decisions will be due on December 31, 2010 **for the first 40 cases that will leave 660 cases waiting and building as this Chancellor presses forward to remove more and more**

---

[13] A actual time line for a mixed pedagogy and misconduct hearing with 13 specifications went as follows: March 2007 prehearing 1 not within 15 days of accepting the assignment of the case as mandated but within 30 days.  Second prehearing to consolidate two misconduct charges for conduct while reassigned with incompetence charges from the school: September 24 2007, hearings begin September 25 2007. Each side called eight witnesses. Approximately 50 documents were introduced. Hearing days after September 25, 2007 were 5 in each of October, November and December 2007, 2 in January 2008.  Closing arguments were scheduled for March 27, 2008 to allow time both for the receipt of the transcripts and for review of some 4400 pages of testimony in order to draft the closing arguments.  Then Glanstein awaited the closing argument transcript and noted in her decision that on a day in the middle of June she convened a meeting to review the closing arguments at which she was present.  She closed the hearings after that meeting with herself and submitted the decision on July 11, 2008.  If she worked 7 days /month and 6 hours a day the 18 hearing days Between September 25 and January 11 would have been completed in by December 6 rather than January 11.  A new transcript service is being used locally such that the transcripts might have been ready by December 20 and the closing arguments held in the third week of January and the decision the first week in March.  That reduces the time from 10 months to 5.5. months but it does not bring the process down to 105 days as demanded in the Agreement of April 15, 2010.  Two further changes would be necessary 1) overnight or expedited transcripts would be needed for all cases on a regular basis which is pricey and arbitrators might have to work 10 or 12 or even 14 days per month plus the home preparation time costing $20,000 to $25,000 a month per arbitrator for 40 or more arbitrators.  That presents the problem of why do these hearing officers earn $210,000.00/yr or more for part time work when the Corporation Counsel, city state and federal judges earn less. All this would be spent in the drive to purge existing tenured teachers and replace them with untenured teachers–is it worth that, for Klein to be a "trustbuster" all over again?

**teachers from duties and bring them up on disciplinary charges.** This is without, as, yet, hiring expedited hearing officers; that entire program will also take time to set up.   An expedited compulsory hearing in lieu of a full evidentiary hearing may not be able to be imposed on those who do not want it; that has not been considered. Further, suspensions for four weeks are rare among the penalties awarded.  In recent years, teachers have received suspensions of four months, six months, nine months, and one year.  Fines of from a few hundred dollars to many thousand dollars have also been imposed.  It might be difficult to find cases for the expedited arbitrators as it appears that the DOE is demanding termination for most of the reassigned teachers in recent times.  It may not get all of them terminated, but any case where termination is requested is not going to go to the expedited arbitrator who can only impose a one month suspension or equivalent fine.  Or perhaps it is satisfactory that the penalty is moderate as long as the teacher is relegated to becoming an ATR thereafter and the plan is to keep the ATRs one year and then terminate them because they have failed to seek or be selected for a regular assignment.

The April 15, 2010 agreement ends with the decree that the backlog will be absorbed, by edict, rather than by plausibility by December 31, 2010.  This is impossible.  Even with expedited hearings at least beginning and some cases settled by mediation, and there are many cases that are settled now.  Thus, 100 cases may be completed rather than only 40 cases in 2010; that leaves 600 left to adjudicate or mediate or settle.  In the interim, many teachers will have been removed from the classroom.  At the first pre-motion conference Mr. Leighton estimated that there were about 525 reassigned teachers; now only a few months later he estimates there are 700. There indeed has been an unusually high rate of teachers "reassigned" since the Agreement was signed.

The Chancellor vastly underestimated how long it would take even if there were 60 hearing officers to clear not only 600 cases, but the increasing rate at which charges are being preferred, they accrue rather than abate.  The more salient question is why are NYC teachers being brought up on disciplinary charges at such greater rates than teachers in the rest of NYS and at such greater rates for misconduct?

A mediator other than the hearing officer is an improvement but none of this is going to eliminate the backlog.  It would require 500 arbitrators, maybe it could be done with 400 or so, and equal number of DOE attorneys and NYSUT attorneys to adjudicate 600-700 3020-a cases and decide them by December 31, 2010, including those who were reassigned after being rated "U" this past week.  That is another 1000 teachers many of whom will be removed from the class room.  It would also cost over $10,000,000.00 to pay for the arbitrators, and more than $5,000,000.00 more to pay for the DOE attorneys and another $5,000,000.00+ for NYSUT counsel to

hire sufficient attorneys to complete the cases by that date as well.  The public that is already decrying the cuts to

public schools would be outraged if in these times of financial retrenchment over $20,000,000.00 was spent to make

sure teachers whose "rug management," "word-wall timeliness," and not requesting "prior authorization to bring

a plant to school" were all appropriately disciplined.

 The only way ro get rid off the back log is for the charges to be reviewed by a panel not employed by the

DOE, an independent panel, and to dismiss all those that are trivial, discriminatory, frivolous.  That is what §3020-a

is mandated to be, needs to be, and rationally should be for the tenured teacher, the students and NYS.citizenry and

that is the way it needs to be restored to NYC, and has always been for the rest of the state.

 The choice of arbitrator, the oversight of the proceedings by the AAA and that AAA mediates when a

recusal is requested not Theresa Europe, the DOE Chief Prosecutor for whom the arbitrators believe they work.

Ten teachers were fired for no reason in a few weeks im 2008 because their union withdrew all counsel from them.

They were forced to under go the arbitration with no representation; they asked the arbitrators to stay the hearings.

Ms. Europe told them to proceed.  The teachers asked that the Arbitrators recuse themselves they refused; the

hearings were essentially *ex parte*.  All the teachers were fired.  The State Court Justices did not want to be in the

middle of this, thus there has not been one teacher to date who has even prevailed in getting a new hearing, though

a few cases are still pending.

 History shall repeat itself.  Most jobs in schools require contact with students: from student program

scheduling, to attendance teacher, to computer lab software maintenance.  Even the menial jobs such as collection

of attendance sheets generally awarded to students for service credit, would bring the teachers into the classrooms,

the corridors and the offices of the schools.  When the Chancellor believed by some unthought out miracle that

doubling the number of arbitrators would eliminate the backlog in four months bringing the teachers into the school

and District offices would be a temporary inconvenience that would soon be over, it was tolerable.  But as explained

herein his plans will not put a dent in the backlog, not at the rate teachers are being removed in order to abrogate

the existing property and liberty rights of NYC teachers.  Soon the teachers in district offices and in schools will

remain underfoot, be contrary to the objectives of the Principal i.e. to remove the teacher from the building.  The

District Offices will become overcrowded and the teachers will be moved elsewhere out of sight.  Thus, there has

been the elimination of the spaces warehousing 325 teachers at Chapel Street, West 125 Street for only 24 teachers

was no less onerous.  Soon the Principals and District Offices will complain, other space, leased, history repeated.

By 2008-2009 333 Seventh Avenue had fewer than 25 teachers amidst the four full block-front floors of administrative offices and a staff of 600 operating all Manhattan Schools, yet Defendant Judith Rivera testified that she could only place a handful in positions while they awaited their 3020-a proceedings.  Only the vast reduction of the numbers of teachers brought up on nonsensical charges in order to reduce overall salaries and eliminate tenured teachers in favor of lower paid untenured ones will dissipate the backlog.

## CONCLUSION

It follows from the above discussion that the rate at which teachers are being removed from their duties is the problem that engenders the situation that the June 27, 2008 agreement which was never complied with in the slightest, was meant to address and which the April 15, 2010 Agreement aims to alleviate, but it cannot.  Yet the most troublesome issues are not even mentioned, i.e. who can remove a teacher (*de jure* Principals cannot, but *de facto* many are, and the Chancellor has been lobbying the legislature that he needs that "flexibility"), how are arbitrators selected, to whom do they report, and whom do they serve.

Because of the subtle and not so subtle ways that the administration of the incumbent Chancellor, has chipped away at tenure, the rights that it is meant to provide as embodied in §3020-a have been so far eroded *de facto,* and *de jure* for Teachers employed by the City of New York that it has become a sham for all of the reasons described in this memorandum.  The Attorney General of the State of New York, will not even assert the legality of the amendments and practices that it has led to for NYC teachers.

Though the amendments to §§3020, 3020-a, 2590 j. 7. may at first glance seem as benign as Plessy v Fergusen,163 U.S. 537 (1896) may have seemed to some observers a century ago, their misuse has led to an egregious deprivation of tenured public school teacher liberty and property rights, that the legislature meant to be for all NYS tenured teachers including NYC teachers in enacting 3020-a in its original form..

This Court must for the sake of our children, our teachers, our schools and our city, restore independent lay panel oversight as a condition precedent to bringing teachers up on disciplinary charges, restore the oversight of the AAA to the selection and administration of the hearings and hearing officers, both as has always been the case outside of NYC and was the case in NYC until a decade or less ago.  To do so Defendants' Motion to Dismiss must be denied in its entirety

New York, New York
June 28, 2010

JOY HOCHSTADT. P.C.
300 Central Park West –Suite 2E
New York, New York, 10024-1590
212-580-99302 12/380 9322 (fax)

By: Joy Hochstadt (JH0935), Putative Class Counsel

25