Request for a More Definite Statement of Compliance re: MOA UFT-DOE 6-27-2008

Heading:   *Temporary Reassignment Centers*

P. 1 ¶ 1.   Superceded by 2010 MOA, but ignored June 27, 2008 to August 31, 2010[1]

P. 1 ¶ 2.   Superceded by 2010 MOA, but ignored June 27, 2008 to August 31, 2010

P. 2 ¶ 1.   Either produce all documents generated by this office since July 1, 2008 or identify the unit and unit head referred to in this ¶ and have that person contribute a detailed report on progress July 1, 2008-June 30, 2010 made in areas of the aforementioned ¶¶.  Indicate how the duties of unit and it head changed from July 1, 2010-December 31, 2010.

P. 2 ¶ 2.   Indicate how many (# and % of all 3020-a charges  Principals not only "investigated" but "signed charges" in the July 1, 2005 -June 30, 2006 interval *cf.*  July 1, 2008-June 30, 2009.

P. 2 ¶ 3.   Indicate how many investigations were made by principals and how many educators were returned to their schools, to another school.

P. 2 ¶ 4.   Indicate how many schools have reassigned teachers and benefitted from return of the teacher or administrator's salary to the school budget by hiring (1) no one (2) hiring a lower salaried teacher (3) appointing or hiring an ATR (4) hiring an educator at the same or higher salary.  For each school year 2006-2007, 2007-2008, 2008-2009, 2009-2010 indicate the size school by #teachers, #students, and # reassigned educators in each of the above years.

P. 2 ¶ 5.  If this is not a modification of Chancellor's regulation C-770, is it an admission the C-770 was not enforced for years when the MOA was executed by indicating the total # of reassigned teachers, 2002-2003: indicate how many where assigned in their home CSD or High School District and indicate how many outside of it, how many outside their borough.  For 2006-2007: indicate how many where assigned in their home Region and how many outside of it, how many outside their borough.  For 2008-2009 indicate how many were assigned outside their borough.  For 2009-2010 indicate how many were assigned outside their borough.  Indicate home many educators were in volunteer assignments,[2] what were their duties.  Indicate the # of educators with assignments since September, 2010.

P. 2 ¶ 6.   Indicate if that protocol was ever developed and append to the report.

---

[1] If Defense wishes to attempt to refute that no implementation was undertaken June 27, 2008-August 31, 2010 it must present evidence of improvements e.g. July 1, 2008-June 30, 2010 compared to July 1, 2006-June 30, 2008, attested to by Chancellor or Deputy Chancellor with oversight for Personnel Management, Human Resources or Labor Relations

[2] Before the present school year teachers requested curriculum assignments were accepted by the central office administrator with their field of expertise and then were punitively not permitted to take the assignment by Defendant Judith Rivera (the "supervisor of the 333 7th Avenue rubber room) e.g. Affidavit of Michael Miller shall be produced when requested.

P. 2 ¶ 7.  Indicate the # of teachers brought up on charges for time and attendance, only, in each of the last 10 years.  Indicate the number of teachers whose arbitrator found them guilty only on time and attendance even if brought up on other charges as well (the other charges were withdraw, dismissed or the arbitrator acquitted them on all other charges.  For each of the years indicate the number of these where dismissal was demanded by the DOE.  For each of the years indicate the # and % where termination was achieved, where suspension was achieved, reprimand and fine.  For fines indicate the median, mean, and extremes.  Indicate when the first time and attendance charges were brought up at regular arbitration hearings rather than expedited hearings.  Indicate the first time a NYC educator was terminated solely on time and attendance charges.  Indicate where in the Ed Laws 3020, 3020-a, 2590, or the CBA there is authorization for termination for time and attendance issues only, in fact for medically indicated time and attendance charges.  Indicate the differences in PIP and PIP plus.  Indicate the rebuttal reasons that the DOE has to counter the assertion made by the UFT that while PIP was to support the teacher; PIP+ is to support beginning the termination process against the teacher.

P. 2 ¶ 8.  Indicate how many Principals have been investigated, charged, and disciplined for false or trivial, or embellished changes against teachers. How many of these were for alleged "whistle blowers."  What were the disposition of the charges in all cases.

P. 2 ¶ 9.  Indicate the # and the % of cases settled before the 3020-a hearing is called for a prehearing conference; after a per-hearing conference but before the start of hearings; during the DOE's presentation of its case; after the DOE rests (except for rebuttal), for each year 2007-2008, 2008-2009, 2009-2010, September 1, 2010 -December 31, 2010.

Heading: *Education Law 3020-a Procedures*

P. 3 ¶ 1 n/a

P. 3 ¶ 2 Indicate the number of arbitrators employed/retained/assigned to hear cases at 49-51 Chambers Streets on June 27, 2008.  Indicate the name, #, and month additional arbitrators were added, or not renewed, or removed between June 27, 2008 and April 15, 2010; between April 16, 2010 and December 15, 2010. Indicate how the arbitrators were allocated as to misconduct and competency on July 1, 2008, January 1, 2009, July 1, 2009, January 1, 2010, July 1, 2010.

P. 3 ¶ 3  Plaintiffs stipulate that the transcription services are significantly improved when expedited transcripts are ordered.  They should be always ordered to be expedited and the closing arguments should be ordered for overnight service.  Indicate the % of total 3020-a transcripts which were ordered expedited  since September 1, 2010.

P. 3 ¶ 4  This ¶ should not limit that continued production and demands for production may continue throughout the case, now that hearings do begin promptly after the preferring of charges

P. 3 ¶ 5 The hearings have become truncated in much shorter time than previously. Therefore neither side should be penalized for calling witnesses on 48 hours notice, or less where justice so requires.

P. 4 ¶ 1 Indicate whether this is reciprocal so that the respondent has the right to object to documents offered for evidence in the same manner?  Also can the Department indicate, why the respondent would not be given greater leeway when the termination of a career and usually a $1 million differential in pension and salary payments is at stake, for otherwise modest net worth individuals.  Their tenured position is the most significant of their assets, exceeding the equity in their homes in almost all cases.

P. 4 ¶ 2   Indicate the letter sent by copy.  Indicate how many reminders have been sent in the interim.  Indicate by copy that it was sent to each Principal as a subordinate of theirs was served charges.

P. 4 ¶ 3   This is an improvement over prior practices in one sense to expedite the process, however, the Department should refrain from abusing it as it does now.  Respondents now have merely days to hire an attorney to represent them (and more are hiring outside attorneys as NYSUT attorneys are no longer trusted to demand procedures, documents, witnesses, dismissal of specifications to the extent that private attorneys who can appeal to the Courts in Orders to Show Cause mid-hearing when indicated can).  Please comment on the statement made by Carol Gerstl, Esq. Counsel to UFT President made to this writer in 2007.  "We have a tacit agreement with the Department that we will not go to Court via Article 75 over disciplinary arbitrations, and the Department will not go to Court via Article 75 for collective bargaining arbitrations."[3])  Therefore, Respondent's private attorneys (most of whom have not defended in a 3020-a proceeding, should not be required to make all notices motions and notices at the pre-hearing conference, but should be able to make such applications throughout the hearing which commences immediately after the pre-hearing conference and the Department should have up to 48 hours to respond and vice-versa).  Too often today, DOE attorneys object to any applications made after the pre-hearing conference when the private respondent's attorney may have noticed an appearance 1-2 days earlier.  Thus, this is one of several ways that truncated, expedited hearing have been used by the Department to abridge due process rights.

P. 4 ¶ 4 What does this mean?  There have been instances where the respondent was fined the arbitrator's fee which averages $1500.00, or more, for missing a hearing session when the respondent was admitted to a hospital on an emergency basis for sudden critical symptoms (e.g. cardiac arrhythmia *viz.* putative class member Theodore Smith).  And one respondent a CSA member, was taken off the payroll because the Department alleged that it was her fault the charges to hearing decision process took over 150 days, not because they delayed for 13 months but because when both sets of attorneys believe they had convinced her to settle, she sought private counsel who explained the implications that the settlement included waiving her right to future due process, and conditions that she would be highly unlikely to be able to always comply with completely, and thus summary

---

[3] In the one most egregious instant where the UFT broke this tradition (a teacher had been thrice removed on the self same charges, same dates and incidents, in each case on the day he was returned to his school after being acquitted twice.  The UFT received no relief in the State Court.  The presiding Justice repeatedly adjourned the case to a new appearance date with ever stronger admonitions for the parties to resolve the matter without Her Honor having to make a decision.

firing within a year or so.  Then when she said she wanted the 3020-a they said she deliberately delayed the inevitable.  Termination for what was entirely a line of duty injury.

P. 4 ¶ 5  The Department often objects even when the data involved are already known to the respondent in the course of properly performing the respondent-educator's prior duties.  Too much of the 3020-a hearings, applications, arguments on applications, rationale for decisions are conducted off the record with DOE-counsel strongly objection that to everything being on the record.  NYSUT attorneys are so enured to this practice that there is no objection from them and DOE attorneys use "that is the way its always been done" to argue that it should continue.  In addition the transcripts are not accurately transcribed.  Every respondent's attorney should be given a copy of the original tapes when they are given the cognate transcript.  Respondent after respondent has complained that a few critical words in respondent's favor have been edited out time and again.  Reliable listeners with no memory deficits including this writer have found this to be the case.  As part of the later discovery process, several plaintiffs and putative class members should be allowed to listen to the original tapes to identify this problem if it exists.

P. 4 ¶ 6  Indicate dates, number and duration and attendance list or minutes from each such meeting.

Heading: *Contract Arbitrations*

*To the extent that this appears to be addressed to issues other than tenured educator discipline, it is beyond the scope of the instant action.  This writer is unaware of any Principal who has not testified in person at a 3020-a proceeding.  Subsequent discovery shall ascertain whether they must be conducted as **ore tenus hearings,** for the arbitrator to weigh each witness' credibility.  Principals have, unfortunately, been allowed to regularly testify at "U" annual rating appeal hearings which are before DOE employee hearing officers, and for either or both of these reasons lead to a << 1% reversal of the "U."  The "U" is then used to bring educators up on 3020-a charges, all unfortunately solely under the control* in practice, of the Principal, without any statutory provision or UFT/CSA agreement (as well as Superintendent testimony) that charges could ever be brought solely by the Principal