UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

THOMAS *et al*,              PLAINTIFFS                        **09-cv-5167**
                                                               **(SLT)(RLM)**
against                                                        **Declaration in Support of**
                                                               ***Pro Se* Motion for Discovery**

NYC DEP'T OF ED, *et al.*   DEFENDANTS

## DECLARATION OF JOY HOCHSTADT IN SUPPORT OF *PRO SE* MOTION FOR DISCOVERY

---

### DECLARATION UNDER 28 USC § 1746

I, Joy Hochstadt declare, verify, certify and state that the facts and statements contained herein are true and accurate to the best of my knowledge, information and belief and are based on assertions of DOE attorneys at 3020-a and other proceedings in their capacity as officers of the Courts of the State of New York, testimony from certain Defendant NYC DOE employees, documents I received from Defendant NYC DOE employees, authenticated documents presented in administrative quasi-judicial 3020-a hearings, assertions made in their clients behalf by Assistant Corporation Counsel ("ACC") of the City of New York where both clients and attorneys all acted at all times under color of state law, and other verified information provided to me by both named plaintiffs and class representatives and their attorneys (where not my own clients), the latter acting at all times as officers of the Courts of the State of New York (and, in all likelihood, all officers of this Court), as well as my own experiences *pendente lite*, in the course of pursuit of my own fully settled claims against the DOE, its Chancellor, several its Senior Administrators, and my former Principal and Assistant Principal immediate supervisors.   Every effort has been made to preclude and safeguard the use of any materials covered by any protective order, that was not later brought into the public domain in a subsequent proceeding.

---

1.    In the over 14 months since this action was brought many of the worst abuses have continued, albeit detention centers are no longer called Rubber Rooms or Teacher Reassignment Centers, the time to 3020-a trial has been reduced for newly charged teachers, there are new arbitrators working alongside the veterans of one to two decades or more.

2.    Though I settled my own cases in October 2009 and received my settlement award from the City at the end of March 2010, there has been a concerted attempt to claw back that money by the DOE and Corporation Counsel, through unwarranted sanctions and costs assessments, when my gratitude rather than extending to practicing law against other than DOE defendants has instead been used to represent a plethora of victims of 3020-a *pro bono* and quasi *pro bono,* for barter, and total contingency (where considerable efforts are being made by unknown influences to delay, where justice delayed is justice denied).

3.    In several cases where Article 78 special proceedings have been brought because tenured teachers were summarily dismissed on August 26 of a given year, because their license was lapsed on July 1 of that year, while their licenses were in full force on September 1, of the same year.  Each was informed that she would be allowed to teach summer school without a license but would be terminated and removed from the payroll before school commenced. This is a clear violation of the 3020 statute which provides:

No person enjoying the benefits of tenure shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article or in accordance with alternate disciplinary procedures contained in a collective bargaining agreement covering his or her terms and conditions of employment that was effective on or before September first, nineteen hundred ninety-four and has been unaltered by renegotiation, or in accordance with alternative disciplinary procedures contained in a collective bargaining agreement covering his or her terms and conditions of employment that becomes effective on or after September first, nineteen hundred ninety-four; provided, however, that any such alternate disciplinary procedures contained in a collective bargaining agreement that becomes effective on or after September first, nineteen hundred ninety-four, must provide for the written election by the

employee of either the procedures specified in such section three thousand twenty-a or the alternative disciplinary procedures contained in the collective bargaining agreement and must result in a disposition of the disciplinary charge within the amount of time allowed therefor under such section three thousand twenty-a.

4.     When I conferenced these cases before different judges in State Supreme Court, the Corp. Counsel tried to dismiss the cases on procedural grounds.  One teacher had filed an action *pro se* and only sought me out when she received no response, though she had served the summons and complaint on the "Chancellor's Strategic Response Team," at Tweed Hall (52 Chambers Street, NYC 10007, which is the Principal place of business for the  Chancellor and the DOE where service was accepted and a signed receipt with the unit's letterhead was provided to the process server.  The other petitioner was informed that she must exhaust administrative remedies, so she awaited the decision of the C-31 committee to which she was referred in error.  The entire transcript was her advocate arguing that she was in the wrong proceeding, the C-31 was for non-tenured personnel, and proof of tenure was provided.  The Committee Chair said that was not the time or place to decide that, the proceeding was scheduled and thus she was summarily fired (as are all non-tenured respondents of the C-31. When she received the decision she was referred to me.  The Corp0. Counsel's posture was that she should not have exhausted all administrative remedies, since the remedy was scheduled before but took place after the notice of termination was given.   Both Justices understood exactly the *ultra vires* acts that had been  perpetrated.  Both Justices considered the cases fully submitted six months ago.  Both Judges were respectfully but forcefully requested, by me, that if there was any question about whether this was not absolutely provided for by the clear language of the statute that the cases should be certified to the NYS Court of Appeals.  Neither Justice has been heard from since.

5.      Dr. Josefina Cruz, was brought up on charges as a scapegoat with her entire Spanish Department, for wilfully not administering the January 2006 NYS Spanish Regents exam, when the charges were a cover-up and a deflection of culpability from the Principal Jerod Resnick and Assistant Principal Judith Silverman who failed to provide all the Spanish teachers with the necessary Regents materials necessary to administer the test.  Two of the Department teachers, joined a group called Teachers4Action which filed an Action Teachers4Action v. Bloomberg *et al* ("T4A") 08-cv-0567 (VM)(AJP) (SDNY).

6.      When frustration with the UFT not doing enough to improve the situation, led to pressure to add the UFT as defendants.  Immediately, for all 61 Plaintiffs,  assigned NYSUT counsel, none of whom were employed by UFT, withdrew, because their costs were reimbursed by UFT and UFT withdrew its intent to pay for the defense of T4A plaintiffs who were suing them.  It was clearly a retaliatory move, as in prior cases, *e.g.* Lucy Rodriguez-Rivera v. DOE and UFT 05-cv-10897 (LAP) SDNY, where an ably disabled teacher held both the DOE and UFT liable for their less than acceptable response to her need for workplace accommodations, UFT hired her outside counsel for her case.  But here, where 61 plaintiffs were attacking the zealousness of the legal representation their union dues were purchasing, in unfounded and unwarranted charges being filed against them, in deplorable rubber room confinement for years, and in conviction rates that were at least as when the respondents to the charges were charged with very serious misconduct, the UFT became enraged.

7       At the special conferences called for the 61 withdrawals, the DOE attorneys and the arbitrators, were given the pretext that there was a conflict of interest because NYSUT counsel, sometimes represented the UFT and considered it a client.   However a perusal of

dockets in New York County, showed that > 95% of NYSUT counsel cases, a UFT member rather than the UFT itself, or its officers were the client.  So why were these clients being abandoned, particularly those with hearings already commenced?

8.   At the "withdrawal" meetings, not one arbitrator questioned any NYSUT counsel as to whether they personally had ever represented the UFT, not one arbitrator denied the motion to withdraw, not one arbitrator even took the matter on advisement or asked whether the NYSUT counsel had requested a waiver from the UFT.  Rarely was the teacher-respondent asked if they objected to withdrawal of counsel.  Almost all respondents said they did not know they could object.  At the withdrawal of counsel conferences, most DOE attorneys and arbitrators assumed that the proceedings might be delayed while other counsel was arranged and that they would go on to other cases in the interim.

9.   One T4A plaintiff, Twana Adams, objected to her counsel's withdrawal.  She was told by her arbitrator, that she should have thought of that before she joined T4A, that joining T4A was against her own self-interest.  Later Ms. Adams overheard an *ex parte* discussion amongst her Arbitrator Andree McKissick, another Arbitrator Eleanor I. Glanstein and DOE's supervising prosecutor for the 3020-a hearings, Theresa Europe in which McKissick stated to Europe and Glanstein, "we are all on the same page" [with regard to T4A plaintiffs], "we'll fix them good."  Adams filed an Affidavit in T4A recounting her overheard *ex parte* communication.  Adams was also the lead plaintiff, in an action <u>Adams *et al*, v. New York State Education Department</u> *et al.* 08-cv-5996 (VM)(AJP) which named all the arbitrators By the time, her arbitrator, McKissick was ready to hear her case, NYSUT counsel had been restored to those cases that had not closed when T4A removed UFT as a Defendant in

recognition of the June 27, 2008 MOA between UFT and DOE (which has never been implemented one iota).

10.    Adams moved to have her arbitrator recuse herself.  The arbitrator refused and said she was the fairest possible arbitrator.  All recusal requests for the rest of the state are referred to the AAA committee on recusal.  There is virtually no likelihood that this arbitrator who had excoriated Adams for joining T4A and for whom Adams had written an affidavit in a lawsuit where the arbitrators were named against this arbitrator, would have not been removed.  This was especially the case since the Arbitrator, McKissick was removed from further service at the behest of the UFT after the completion of the cases already on her docket, but notified of her termination before the Adams proceedings.  Adams charges were the most frivolous imaginable.  After being seriously injured by a student, in excruciating pain as the student's assault aggravated a recent injury from which she had only recently returned to work, having taken a combination potent analgesics which she carried because of that prior back injury, Adams was required to complete an injury report before leaving the building for treatment.  She made a clerical error in printing the Principal's last name and honorific on the wrong line.  The Principal who was already harassing and targeting Adams, called it forgery, the investigators called it "writing principal's on wrong line," the Special Commissioner for Investigation ("SCI") witness, testified that the inadvertent error could have been better corrected at the school level without calling in SCI.  The arbitrator also said the error was inadvertent but that Adams had made a serious mistake and fined her 30% of her paycheck for an entire school year.  Adams, always lauded for her outstanding teaching, is seeking to leave the DOE both because the financial hardship of the last year and the abuse of the three

prior years in the rubber rooms.  It will be the loss of an outstanding educator, to the children of NY to whom she devoted herself.  Her Article 75 proceeding was dismissed on the basis that the "AAA arbitrator," must have carefully weighed the evidence.  The fact is that there was no AAA arbitrator, just one of a handful cherry picked by the DOE and embedded with the DOE for years (hearings are always at DOE premises where Theresa Europe is a constant presence to ingratiate herself with the arbitrators in numerous *ex parte* contacts).  The arbitrator having shown her bias in her *ex parte* statements about T4A plaintiffs and how they should be treated before hearing Adams case, and excoriating Adams for joining T4A and advising her to quit the T4A Action (both on the record) and McKissick having known she was let go before Adams' hearing are the basis for reconsideration and reargument pending

11.   While Adams did have her counsel restored before her hearing, at least 10 putative class members, including two putative class representatives, Cruz and Santucci, were forced to undergo the 3020-a proceedings unrepresented because of the withdrawal of their counsel.  The hearings took place in March of 2008 and in May of 2008. [They were stayed by Order of Sheila Abdus-Salaam, JSC (now appointed to the 1st Department, Appellate Division) for April but the stay were lifted in May.  Each asked for the recusal of their arbitrators when the arbitrators failed to stay the proceedings longer (it was a matter of 3 weeks or less, between the time the their hearings closed and the counsel issue was resolved).  The trials were held at warp speed.  Testimony in Cruz case was about five hours.  Her only participation in the proceedings was to constantly reiterate that the process was unfair, that she needed counsel, that she did not know what to object to in the DOE's case, that she did not know what

questions to ask and thus conducted no cross-examination, that she was unable to put on a case of her own. She required assistance of counsel. She had paid over $13,000.00 in union dues one of the benefits of which was guarantee of representation in professional matters, she was entitled to counsel as part of her union benefits. Santucci did the same thing. There was a rush to judgment. The arbitrators heard only what the DOE presented.

12. The hearings were not even conducted as inquisitions, as no arbitrator queried any of the witnesses, no arbitrator, objected to any questions from the DOE to the witnesses. Both testimony and non-testimonial evidence was entered into evidence without foundation, *voir dire* or examination of any sort. Eight of the ten were fired after this process. Not a single one prevailed in State Court that their hearing denied them due process.

13. The two who were not fired included putative class members Boubaker Fofana and Roselyne Gisors who received several month suspensions. Fofana had been subject to a 3020-a previously, in which he was completely exonerated and acquitted, but it gave him a model for the conduct of a successful defense. Gisors complained to the Departmental Disciplinary Committee that her arbitrator was conducting the hearings in a manner that constituted mis-conduct. Both challenged their suspension in Article 75 proceedings *pro se* as did all but one of the 10 teachers who had no representation for the hearings. All challenges lost, including Santucci's whose Justice stated in conference that she thought that there was no due process where representation was denied and sent Corporation Counsel back to their clients to try to settle the case by offering a new trial. Then Corporation Counsel tried to defeat the Article 75 proceeding on procedural grounds of timeliness of filing and of service. They lost on both the procedural issues but ultimately won on the merits, when the UFT

refused to represent Santucci because it represented no respondent whose hearing was closed

prior to the resolution of the counsel issue.  And because there were already several of Justice

Alice Schlesinger's colleague at the NY County Supreme Court who had ruled the way the

City had argued that the teachers could have retained outside counsel on their own initiative.

The one who did not challenge her dismissal after this type of a proceeding, was putative

class member Gloria Chavez, who signed a retainer agreement with me and then met with

her mental health professional and decided she needed the money and did not want to dwell

on the DOE travesty any longer.  Her firing was a travesty, in many decades of outstanding

instruction in the Spanish language, she has a stellar and unblemished career.  When her

Principal, Jerod Resnick, assigned a Chemistry Teacher Judith Silverman to supervise the

Foreign Language Department as Assistant Principal, he failed to see that she understood that

oral components of foreign language Regents exams must be delivered to the teachers as

soon as they arrive as it will require the balance of the semester for each student to be

assigned a verbal set of tasks and then prepare and deliver an individual recitation to the

teacher one at a time (usually one a day, while the balance of the class has a reading or

writing assignment).  When the Spanish Department teachers all failed to receive the

materials until just before the exam, despite relentlessly requesting them from Silverman,

who was unfamiliar with the process, they were unable to assign and conduct individual oral

exams.  After the exam when students and parents complained to the Superintendent that the

highest possible grade on that Regents administration was 76 rather than 100 and was

becoming an impediment to their college admissions, the Superintendent Santiago Taveras

came to the school and queried Principal Resnick about how this came to be.  Resnick

answer "the teachers did not administer the Regents Exam." Taveras shot back "fire them," and thereafter the theory was proposed that the entire department was in some conspiracy not to administer the test. This was absurd.

14.    There are several examples where in the premises of the DOE attorneys and earshot of Theresa Europe (Deputy Counsel to the Chancellor), the DOE administrators give conflicting testimony from what they give at depositions when the teacher sues. In Plaintiff Cruz and Putative Class Member Chavez case at their 3020-a hearings Resnick testified that the teachers failed to administer the test. He did not know why; it was some conspiracy on their part. At earlier depositions in an ADEA case *Shapiro v. New York City Dept. of Educ.,* 561 F.Supp.2d 413 (S .D.N.Y.2008), where Chavez and Cruz were plaintiffs, Resnick testified truthfully that it was a failure of administration to not have distributed the tests in a timely manner. Because Cruz did not participate in the 3020-a other than to reiterate that she required counsel, that she had a good rapport with her attorney Mitchell Rubinstein, that he lamented that he was directed to withdraw by his employer law firm of James R. Sandner (General Counsel for NYSUT), and that she was unable to defend herself, the conflicting testimony, would have impeached Resnick, demonstrated that Taveras "shot from the hip" on misinformation he was provided by Resnick and that both Resnick and Taveras could say the teachers would be terminated, and deflect further ire from themselves.

15.    Surely in Chavez case, since that was the only charge against her, it would have saved her job, unless the arbitrators are even more under the thumb of Theresa Europe than I believe they are.

10

16.     In Cruz case, because she needed, requested and won workplace accommodations from the DOE medical department (but which Resnick sequestered in his desk drawer and never conveyed to her, but instead acted contrary to the directive to him and assigned her to classrooms that had her going from floor to floor from one end of the building to the other in the 3-4 minute transit between classes), Cruz was harassed as soon as she requested the workplace accommodations.  She was cited for being tardy to classes when her sequestered accommodation request granted her a single classroom for all her classes.  Therefore, they bolstered the charges with the usual trivia.

17.     The quote from Assistant Principal Laurice Chambers-Blake that she was instructed by Principal Iris Blige to "focus on weaknesses and deficiencies" rather than positive skills of teacher Blige wanted to oust to the rubber rooms rang true.

18.     I have read a host of teacher observations and usually from the first sentence one can tell when that is the core principal of the observation report.  This kind of a directive, inevitably results in both "U" rated subjective evaluations and to deniability when asked in the DOE setting of the 3020-a whether the witness had ever specifically been told to write up unsatisfactory rated observations.

19.     In my own case, in the DOE run 3020-a, then Assistant Principal Richard Weiss, testified against me to defend his observations; however, in the UFT premises where the depositions for my litigation was held, he admitted that from the very outset when he was hired before there was a class held or students appear for the start of the school year, he was informed that the Principal did not want me to teach in "her" school, wanted me out.  While the Principal at all times testified that she had the right to assign me to teach an entire program of Special

Ed. self-contained classes (only special ed students in the class and most of the classes had two or more students who were diagnosed as Emotionally Disturbed) even though I held no special ed license), the NYCRR for teacher assignment state otherwise.  Arbitrator Glanstein accepted the Principal's view that I did not adequately manage the comportment of the classes assigned to me and fired me, likely the best prepared and most knowledgeable of the Biology Teachers that have ever taught at the DOE.  Randi Weingarten is her charge to the EEOC in 2005 testified that I should have been assigned the Advanced Placement and Honors classes.

20.   The "expert" sent from DOE to team with the ACC at the settlement conference agreed that it was unlawful to have assigned me self-contained special ed classes, and I was granted a sizeable settlement.

21.   Tenure should be meaningful.  The difference between a teacher being unlawfully discharged, coerced to resign by allowing them to stay on the payroll an extra few months beyond when the 3020-a decision would have been expected, or coerced to stay as an ATR with the constant debate whether they should be let go until they can be caught in violation of the draconian agreements they must sign to settle the 3020-a and summarily dismissed.

22.   The majority of the cases, at least until this year, were settled before or during the 3020-a. The settlement always includes a set of conditions, which if the person ever violates even once leads to summary dismissal according to the four corners of the settlement without the right to due process or access to any court for anything that is a part of the settlement agreement.

23.   Thus, a teacher with a 90 minute commute each way with numerous transportation transfer along the way, who should have been place in a school more convenient to her, was instead offered a settlement that included summary dismissal for any aggregate tardiness in excess of 53 minutes in any school year; she was fired within a year.

24.   A recovering alcoholic who had not relapsed at all in the entire three years she was re-assigned and allowed to stay in her school and prepare the lessons for her students and grade their work for six months after a single unfortunate incident signed that if she ever showed any symptoms at school she would be summarily fired.  Her father died, she relapsed briefly at the family home during the bereavement period, she was not even at a school, she attended an offsite workshop for teachers and took ill there.  She was fired within a year of the agreement.  An putative Class member, Assistant Principal, Dr. Lisa Vecchione, suffering debilitating nerve injury in a Line of Duty ("LODI") injury, was charged with excessive absence between the time she was evaluated by the DOE physician and granted the LODI excusable non-attendance, and the next time she was again evaluated and again granted LODI non-attendance, because the approval dated the date of the first medical exam did not reach her for five months.  In the interim her Principal Wanda Holt refused to sign and pass along to medical, the necessary forms and medical records, absence records submitted to her regularly stating that she never received them.  Despite no misconduct or incompetence ever being charged, and despite the Payroll secretary testifying that Dr. Vecchione sent everything to her that she had a complete record, and after recording the data, passed all the forms and reports to Principal Holt, the Arbitrator fired Dr. Vecchione for excessive absence.

25.     To add insult to injury when Dr. Vecchione applied for unemployment benefits the DOE opposed stating that she was physically unable to work, though her physician had cleared her for unrestricted work with modest accommodations provided (low rise elevator building and occasional brief rest periods when indicated) eighteen months earlier.

26.     The dismissed tenured employees (this case is only about tenured educators), and it does not address any changes in the standards for granting tenure, to newly hired educators, stand to lose millions of dollars each when salary and benefits and future pension payouts are considered.

27.     Having been granted tenure under NYS law, each tenured teacher and administrator has a very substantial property interest in their DOE employment and its associated benefits.  It is for all their greatest asset.  It cannot be ignored, mendaciously confiscated as in the case of several of the plaintiffs in this suit, nor defended by Corp. Counsel by stating that NYC doe not have to follow any of the rules–it is different and that anything that was wrong has been fixed by the April 15, 2010 MOA between the UFT and the DOE.

28.     The only thing that is different about NYC is that what is agreed to by the DOE and UFT in their CBA can supplant Ed. L. 3020-a.  While we allege that, that is unconstitutionally vague *carte blanche* that has been given by the legislature because the DOE can coerce the UFT into provisions and in fact did coerce the UFT into supporting that very legislation.  See Exhibit 1 Article 21 G changes in 2000, that so far only affects the way arbitrators are chosen and the way the new MOA of April 15, 2010 is implemented.

29.     I served as 3020-a counsel to Malcolm Menchin in December of 2010.  The DOE pouted for

         many shortcuts, denial of discovery, off the record rulings on applications and whined

         whenever respondent's counsel insisted on anything "that's the way its always been done."

30      When the response was "well its high time that it changed if there is to be any due process,"

         DOE counsel would return with a supervisor to support that was the way it should be done.

31.     In the last 46 months the DOE has arrogated to itself, that the Chancellor has the right to

         delegate the right to prefer 3020-a charges to the Principals, and the DOE defends that he has

         the right to make such delegation.

32.     We contend that what he has done is to invest in a single individual the power to be both the

         chief complaining witness in any discipline case and the finder of probable cause that is not

         allowed.

33.     Ed. Law 3020-a does not allow it–3020-a requires a majority vote of the entire school board.

         Ed. L. 3020 says only what is in the CBA–it is not in the CBA nor in th MOA's.  Ed. L.

         2590-j.7 permits Community School Superintendents to bring charges (presumably on the

         recommendation of the Principal, but ast least there is oversight and the Superintendent can

         be made accountable for frivolous charges.  Principals have been empowered to do too much

         to subordinates in the last decade and the children suffer.  Submissive intimidated educators

         do not inspire, are not empowering role models and the role models are being sent to the

         rubber rooms–yes still albeit called something else.

34.     Mr. Leighton can cite all the decisions his Department has won –but can he cite any justice

         under the law?

35.     The only way that we are going to get from arbitrators who like the high pay, and little work of the 3020-a proceedings, intimidated state judges who do not want to be publicly excoriated by the Mayor as he is now doing with Justice Emily Goodman for not allowing him to remove deputy sheriffs from the payroll *pendente lite*, or SDNY Judges who believe teacher rights cases are beneath their stature.  In fact, the SDNY has recently (applicable to my last three cases which were filed in the last three months), referred all employment cases except those with FLSA claims to mandatory mediation, hoping to relieve its judges from having to deal with such "scut" work.

36.     Dr. Cruz has been denied justice all along.  Her first case now before the United States Supreme Court, was that the Corp Counsel convinced USDJ Jed Rakoff that he should abstain from both her and Ms. Chavez claims in the ADEA case because their 3020-a was pending.  Her lawyer in that case <u>Shapiro *et al.*</u> also left little time for their testimony or questions to Resnick and Silverman.  Therefore, despite Dr. Cruz voluminous expansion of the record with documents for the 2nd Circuit appeal, the second circuit had very little testimonial evidence to review.  Her petition for a grant of a writ of certiorari now under review, asks when has one exhausted administrative remedies.

37.     Her applications and claims have been dismissed because of abstention when she was represented, filing the wrong form (an action instead of an Article 75 petition) when she was *pro se* in order to claim her constitutional rights to a fair arbitration. Where does she get her merits heard maybe after remand from the Supreme Court of the United States.

38.     The worst injustice is the entire way the <u>Adams *et al* v NYSED *et al*</u> 08-cv-5996 (VM)(AJP); this case is a continuation of T4A after a schism between two groups of plaintiffs.  From the

16

outset the Court wanted to know where the UFT stood on the issues.  Soon the controlling

plaintiff and the first named plaintiff Florian Lewenstein who was paying large counsel fees

for the entire group wanted the UFT as a defendant.  Then the Court knew where the union

stood.

39.     The Plaintiffs were prewarned by their counsel Edward D. Fagan, that if the UFT was sued

Charles G. Moerdler of Stroock Stroock and Lavan would undoubtedly represent the UFT

and Randi Weingarten its President as Moerdler had been Weingarten mentor, when she

worked as an Attorney at that firm.  Fagan also disclosed that Moerdler and he were arch

enemies from a case where the Swiss Banks were being sued by Holocaust survivors for the

possession and sequestering of their precious artwork looted by the Nazis in the 1940's.

Fagan represents the survivors and Moerdler represented the Defendant Swiss Banks.  Fagan

also disclosed that Moerdler was involved with proceedings to seek the disbarment of Fagan.

40.     Nevertheless the impulse to include the UFT as Defendant along with Randi Weingarten and

another UFT employee, was implemented.  Moerdler arrived in the Courtroom and was given

deference by the Court in their manner of dealing with him.  Fagan was disdained that the

Court even had to deal with an about to be disbarred attorney.  By the time Fagan was

actually disbarred in December 2008, and was soon to be removed as an officer of the SDNY

some months later, the Court really had trouble considering the "left at sea" plaintiffs were

distinct from their former counsel.  Some of the Plaintiffs had been militant in the Courtroom

especially when they all lost their assigned counsel.

41.     Dr Cruz was one of seven plaintiffs that stuck it out until the end.  Most fell by the wayside,

in or about June of 2008, when they could be dismissed without prejudice or pay costs to the

City and State.  Magistrate Peck recommended they be assessed $200,000.00, and Judge Marrero reduced it to about $11,000.00, which meant the remaining seven plaintiffs each paid about $1,500.

42.     The group remained *pro se* from January 2009 until September 2009 at which time they requested that Nicholas Penkovsky observe to see if the Court was abusing them.  Penkovsky became attorney for the group in October 2009 and Adams and Cruz who had each retained me for their Article 75 challenges to their 3020-a arbitration then asked me to represent them in <u>Adams *et al.*</u>   Once they were represented the abuse shifted from the plaintiffs to their attorneys.

43.     Penkovsky at one point moved the Judges to recuse themselves.  Nevertheless, I received the brunt of the abuse because the Court did not understand that my need for extension is an imperative to the nature of my practice as explained in my attached letter to Judge Marrero. Exhibit 2.  It is the 10 day statute of limitations in filing an Article 75 petition to vacate or modify the 3020-a arbitral award, followed by a 15 day period in which to effect service.

44.     With thousands of pages of transcript the norm and 80+ page decisions, other matters sometimes have to take second priority.  I would have had this declaration completed by midnight last night, except that I wound up reading 155 decisions where the UFT represented the plaintiff, everyone won at least in part or was settled to the satisfaction of the parties.

45.     Therefore, in the <u>T4A</u> and <u>Adams et al</u> cases in both federal and state court the Courts wanted to all know where the UFT was on the issues.  No UFT, no remedy

46.     Apparently that is why I was able to settle my case as well.  I hope that does not happen here. The union should not be the only final arbiter of what is meritorious.

47.   There is much to be discovered there are reparations to be paid for past abuses that are supposedly corrected with the April 15, 2010 MOA, but were they.

48.   The physical conditions of the rubber rooms let to numerous serious health problems and at least two deaths.

49.   The MOA acknowledged that it was bad for business or at least bad for publicity.  There has been additional publicity about the mistreatment of teachers, including the article submitted to the Court on Monday.

50.   I am more cynical about why the Principal Blige got off so easy–it was not because her case was weak as the article suggests.  That would be a reason for dismissing the charges against her but rather it is because such behavior is actually being taught at the "Leadership Academy," the route for new Principals to be appointed and seemingly the only route.

51.   All the attachments and articles are hearsay of course, but the way to see if they can be developed into evidence to be used at trial is to allow discovery.

52.   I have invoked numerous issues that are framable as interrogatories, document demands and admissions.

53.   Inherent in Klein's February 2, 2010, one year ago today testimony to the NYS legislature was the plea to allow Principals to bring 3020-a charges, if he was not *ultra vires* in delegating a power to them that he knew he did not have the authority to delegate, why would he lobby for a power that he already exerted legally.  Klein's lobbying for that change is evidence that he knew it was an impermissible delegation because it is neither explicitly specified in the CBA or in 3020.

54.   Attached as find other hearsay that needs testimony, discovery and trial, to test its validity.

55. In the interest of justice, I implore the court to allow Dr. Cruz to formulate her questions, demand documents and make admissions perhaps some that are suggested by this declaration.

56. It is also necessary that the Defense motion to dismiss based on mootness is only now ripe for his status report on how the April !5, 2010 MOA has been implemented and all the other issues raised in my request for a more definite statement by the Defense.

57. The defense position that the Motion to dismiss where the law has been changed from the rest of the state, this is a facial challenge it should not be dismissed without the Defense at least defending a rational basis for each change in the law and each change in the CBA that differs from Ed. L. 3020-a.

58. They must also answer for departures in fact from both Ed. L. 3020-a and the agreed upon CBA which are non-compliant and unlawful.

59. Given that 14 months have past since this Action was filed it is even more imperative that discovery commence in full force at this time.  The Corporation Counsel has been able to defend its Client the DOE, but both act under color of law and must provide due process, equal protection, and above all justice and that has not happened except when the union and the DOE agree on something.

60. Many of my client's cases are as meritorious as mine was, why should the determining factor, only have been whom the UFT selects for prosecution of their claims.

61. In fact, putative class member Roselyne Gisors was all set to have the her case filed in federal court in March 2008.  It was then revealed that she was a plaintiff in T4A, and the

UFT/NYSUT withdrew from both her defense at the 3020-a and from filing and prosecuting of her case only days before it was to be served and filed.

62.    As I previously indicated to the Court, should there be any doubt as to how this Court should interpret NYS law or should there be hesitancy to interpret it, the facial questions can always be certified to the New York Court of Appeals.

63.    I implore the Court to accept this declaration and supporting documents in favor of not delaying discovery any longer than the 14 months it has already been delayed.

64.    I also had to rotate between this declaration and my reply in a petition for cert from the Supreme Court of the U.S. which was distributed for February 18th Conference, today, and that said 15 hour delay is excused.

New York, New York
February 2, 2011

/s/
_____
**Joy Hochstadt (JH0935)**

21