# RUBBER ROOM II: WHAT STEVE BRILL NEVER LEARNED

## By Dr. Joy Hochstadt, Esq.

Mr. Brill has only a small slice of the story.  Most of the teachers in "Rubber Rooms" awaiting disciplinary hearings have mixed charges -- perhaps only 50 do not also have some charge of insubordination or misconduct to "beef up" the incompetence charges--most of which are *de minimus* and could be said of any teacher.  The observation process is that for a favored teacher only positive comments are made, for a disfavored teacher only negative comments are made when in reality both sets of comments are equally true of both sets of teachers.  The real problem with our inner city schools is that the students are only in school ~6 hours/ day and they leave to an educational vacuum for another 18 hours a day.  Middle class children and those who come from cultures where scholarship and knowledge in general is a pre-eminent value, receive another 10 hours (or more on non-school days) of constant education, discussion and mental challenge.  The way to change the learning of the kids and help their undereducated parents as well, is to pay parents of low performing students to attend school first to learn what they want to know: computers, diction, ESL, native language arts (most who emigrated to the U.S. during their own school years may not have mastered grammar or composition in any language if they did not thrive as students after arrival here), auto mechanics, ethnic cooking, sewing, etc.  Then their children will see the drive for mastery (of anything) in the home and model it.  The parents have a sense of what they are missing and once they have mastered sufficient basic skills of the "3R's," even from other types of classes where the two are blended, will covet classes in history, science and literature, etc.  Many will be glad to receive minimum wage for this, others will trade higher paying jobs when possible for education, professionals will be encouraged to imbue more to their children if their offspring are not thriving in school.

The incompetent teacher/rubber room syndrome is largely a pretext for our "trust-busting" Chancellor to "union-bust" and see the demise of tenure for mainly two reasons -- more top-down control (which will not improve student performance with out the drive to learn which I address can be changed as described above) and to save money by lowering the average teacher salary, by claiming 30 year veteran-teachers are suddenly incompetent (as well as to save

1

billions on pension payments by getting teachers out of the system at lower final salary and fewer years of pensionable service both of which determine retirement payout).

Now let us turn to the wider view of the "rubber rooms" than the narrow slice Mr. Brill has observed. The typical teacher in a "Teacher Reassignment Center" has served with an admirable and unblemished record as a tenured School Teacher until s/he requested a transfer to a school closer to home, or one with a higher achieving student body and was granted a seniority transfer around 2003. Or a particularly favored teacher in a school to which a new Principal was installed, or was transferred to a school because of a school closing, etc since Mr. Klein was made Chancellor has been targeted.

Veteran tenured teachers previously had the option of receiving seniority transfers to another school by ranking their choices of known vacancies; the teacher with the greatest seniority not already placed in a school ranked higher by them would be appointed. Until 2004 this seniority transfer program was maintained as a contractual provision in the Collective Bargaining Agreement ("CBA") between the United Federation of Teachers ("UFT") and the Department of Education (compare the 2003-2007 CBA and subsequent CBA's with earlier CBA's). The 2003-2007 CBA was ratified and implemented retroactively in the summer of 2005; therefore, the last seniority transfers occurred at the end of June 2005.

Prior to that time new hires were either from direct hiring of teachers applying to a particular school, or from central office assignments where the central office tried to offer the Principal of a school a choice of three eligible candidates from which the Principal was expected to select one. For some shortage areas, a selection from three was not always available. The shortage areas were traditionally math, science and special education. This open hiring was allowed only after all the seniority transfers had been matched to a vacancy on the teacher's prioritized list of vacancies in descending order of preference.

For 2006 and thereafter, all hires and transfers were guided by a market based plan that did away with the seniority system. Also until that time schools were allocated "slots" for teachers based on the number and type of classes taught. Though statistics were kept on the average teacher salary in each school as an indication to parents of the experience and education of the faculty in that school, salaries were not individually budgeted to specific schools and there was

no incentive or disincentive to hire a teacher based on the teacher's salary. If anything, schools sought to have the highest teacher salaries, as it indicated faculty stability, low turnover, high experience, and increased educational achievement on the part of its faculty. This all changed recently as well. The Principals traded their own tenure for complete control over the hiring, budget and performance of students in their schools. They also gained the opportunity for as much as 50% (or greater) incentive increment in their own compensation based on student performance, including standardized tests, promotion and graduation rates, student attendance, number attending four-year colleges after graduation, *inter alia*.

The Principals complained that it was unfair to be held so fully accountable, until they gained the right to purge the "deadwood" (as the Chancellor put it) from their faculties. The Chancellor agreed and encouraged Principals to request a Technical Assistance Conference ("TAC") with DOE attorneys to help them build an incompetence or misconduct case against a tenured teacher. At one point the Chancellor announced that he was going to hire 100 additional full-time attorneys to be dispatched in teams to go out to the schools to work with the Principals to more efficiently build the case against tenured teachers and remove the tenured teachers from the classroom earlier. (This plan was abandoned based on public outrage to the idea of going after teachers.)

Another mechanism to purge unwanted tenured teachers was to close a school for failure to meet acceptable achievement criteria and to reorganize the school, whereby its faculty was chosen anew by the new Principal.

Tenured teachers not selected for the reorganized school were assigned as Absent Teacher Reserves ("ATR"s) to substitute teach on a day-to-day basis at their full salary (sometimes at top pay of $100,000.00+ per annum with excellent benefits) while the typical substitute can earn no more than $28,000.00 each year even if every school day is worked; no benefits are received by true substitutes.

Since each dollar of teacher pay was now accounted for in each school's budget, teachers at the top of the pay scale were targeted as two ~$50,000.00/yr. teachers could replace one $100,049.00/yr teacher (life-tenure, notwithstanding).

In practice, however, the Principals latched on to the concept of "deadwood" which became a misnomer for the targeting of tenured teachers whose loyalty to the Principal in the face of Principal manipulation of test and other data was not assured (and could threaten the Principal's salary or longevity in the job).  Tenured teachers who were already demonstrated "whistle-blowers" were targeted.  The rubber rooms, in fact, are filled with such "whistle-blowers" who challenged misuse of school funds, changing of Regents Grades to better scores, tolerance of scandalous/criminal conduct of teachers with students, grievances filed for inaccurate and unfair observation reports with detailed rebuttals of same.  In fact, several of my clients represent each of these "whistle-blower categories, and then some.  Eventually these teachers file a Div. Human Rights claim, an EEOC claim and a lawsuit in federal court and were retaliated against then or even before they filed with any Court or Agency.  Tenured teachers who are too astute and are able to discern the meaning of a Principal's words and actions despite other pretexts were not to be trusted.  Tenured teachers who had been in the "system" for many years and had seen the Chancellor's Regulations' as they developed before Klein arrived, were not rescinded, and knew non-compliance when they saw it, were dangerous, especially if they as much as raised a silent eyebrow at a non-compliant practice.  Tenured teachers who would dare file a grievance against their School Administration for any such non-compliant practice were to be eliminated as was the case with each of many of my clients.  It also turned out that these tenured teachers had the highest salaries and for that reason alone became the undesirables now that teacher salary was directly billed to schools.   There exist mechanisms other than bringing a teacher up on charges of incompetence (and if the incompetence charge is sustained that teacher will likely never work in U.S. public schools again), to remove a teacher who has a mental or physical disability.  In New York City alone (written as in any school district for a city of over 1,000,000 in population) NYS Education Law §2568 allows the Superintendent of Schools to require a mental or physical exam, or both, to ascertain whether the teacher is fit for duty, albeit that population provision is synonymous with NYC.  Teachers can be retired on disability pension if they do not meet the medical standards.  This mechanism is not used with teachers who have fewer than 19 years of service or unless the disability is caused by a line-of-duty ("LOD") injury, because the disability pension would entitle the tenured teacher to greater retirement income than they would receive in regular pension income.  Too often it is used to

target a teacher without any due process; just a DOE MD's signature determination as not fit for duty.

Further, both teachers and the UFT made claims of Age Discrimination and denial of Dur Process.  By 2005, the disparate impact and disparate treatment of older, higher paid teachers, had reached such proportions that Randi Weingarten, then UFT President, filed an age discrimination case on behalf of all members over 40 who felt that they had been unfairly disciplined through negative evaluations because of their age, with the EEOC.  After two years of investigation, the EEOC sought to conciliate the case with DOE but was unable to obtain agreement on any change in DOE policies.  The EEOC sent a right to sue letter ("RTSL") to the UFT so that it might litigate the case.  The UFT decided it would pursue individual actions, if any, since of the original sixty teachers named in the complaint and whose cases had been thoroughly investigated by the EEOC which included several rubber room assignees.   Thirteen teachers from Graphic and Communications Arts High School ("GCAHS") had initiated an action under Age Discrimination in Retirement Act ("ADEA") on their own , other teachers had by then retired and moved elsewhere, *inter alia*.  The EEOC issued 60 RTSL's to the named charging parties, in the UFT complaint.  Only one action was ever filed on behalf of one tenured teacher by the UFT based on those RTSL's.   That action was filed in March 2008 and is pending.

Those teachers who were not made aware of the original call for teachers to come forward in 2005, or whose targeting came later, were not included in either the RTSL's or the subsequent UFT contemplation of Action(s), soon found a new action that was organizing or once filed in January 2008, that was seeking additional plaintiffs.  The group called itself Teachers4Action ("T4A") and its focus, in addition to the unwarranted and orchestrated removal of teachers from schools on pretextual grounds of misconduct and incompetence, was teacher mistreatment after administrative reassignment away from their school, and serious problems with the way the 3020-a process was being conducted in NYC.

Teachers having been assigned to a Teacher Reassignment Center aka "Rubber Room" many, three years earlier with still no adjudication of the "charges," joined T4A in March 2008. At the first meeting of the group that some of the teachers attended, one teacher heard the

suggestion that many of the hardships the tenured teachers had to endure were those due to practices that did not occur outside NYC. Outside NYC tenured teachers had a choice between the 3020-a statute as written and the CBA; only in NYC was there no choice. Thus, only NYC tenured teachers lost the right to a three member arbitration panel for incompetence cases; only in NYC were arbitrators not chosen by the tenured teachers but by the UFT and the DOE to a permanent panel where tenured teachers saw the arbitrators work 54 days per year at up to $2000.00 per day plus expenses and fees for decision drafting. The average one day a week jobs (actually five days per month for ten months and two days per month for July and August) were coveted as it allowed the arbitrators freedom for the rest of the time to pursue whatever work or other activities while providing a guaranteed base pay. The hearings were held in the DOE facilities and where the DOE attorneys maintained their offices. There was much *ex parte* interaction between the arbitrator and the DOE legal services department of the DOE which led to another lawsuit. See, Castro v. Dept. of Educ., 08 CV 7580 (LAP).

The hearings are protracted because of the maximum of five days per month that the arbitrators are allowed to work (Possibly so their compensation does not rise above $150,000.00/yr to be noticed on public payrolls where few earn this much). The waits in the crowded, windowless rubber rooms can be and as it was for many teachers more than three years. Teachers removed from the classroom are assigned to be confined in "reassignment centers" which are foul-smelling overcrowded cramped spaces where life-tenured teachers outraged at their inconceivable removal when they have committed no wrong sit amidst a few teachers who have done some act(s) appropriate for some type of discipline, along with many more teachers who are emotionally paralyzed and disconsolate at what has occurred to them for no good reason but several unlawful reasons that they are older, at the top of the pay scale at slightly over $100,000.00 (not reached until 22 years of service), highly educated [teachers only reach top pay if they have an earned master's degree plus the equivalent of a full year's full time semester hours after the Masters degree (30 credits) or a Doctorate] and not wanted by their new, younger, over-empowered Principals (by Chancellor Klein, who specifically authorized Principals to rid their schools of unwanted tenured teachers). Apparently deliberate on the part of the DOE. One DOE Official who oversaw three-year confinement, testified on June 30, 2009, in another proceeding that the number of reassigned teachers has doubled to trebled since Joel I.

Klein became schools Chancellor. In each borough there are enormous full floor facilities to detain "reasssigned" teachers. In 2007-2008 there were 756 tenured teachers so assigned.

The Teacher Reassignment Centers as these warehouses are officially called but better known as "rubber rooms" are specifically designed to be hostile work environments, where the tenured teachers are treated as Pariahs and disdained by other DOE employees, especially by clerical level employees, or uniformed security guards who are assigned to oversee their confinement and record their movements. No work is allowed in the rubber rooms, no electronic devices, no visitors. The process is aimed at the demoralization of "reassigned" tenured teachers so that they will resign rather than undergo years of confinement without any duties followed by months to over a year of the disciplinary trial itself only to have to relive all the false accusations with which they were harassed in the first place. Then having to be subjected to false testimony, from several witnesses, was a dejecting and dispiriting ordeal.

Kinicky Bernstein Associates, reviewed the to-scale floor plans of the rubber room area and found blatant violations of Building Department Codes of New York City. A reassigned teacher was provided with data from Architect Ricardo Hatton of Kinicky Bernstein that the room to which teachers were confined daily at the Rubber Room of 333 7th Ave. in Manhattan was not only severely overcrowded, but in gross violation of New York City's Building Department Codes. A room of 1000 square feet designed for conferences for, at maximum, forty people, was being used to warehouse and confine almost eighty tenured teachers daily quite similar to holding cell or concentration camp conditions.

To add to the pervasive hostility of the "rubber room" atmosphere, the Public Employees Safety and Health Agency ("PESH") has issued numerous violations, for inadequate air circulation, stale air, inadequate means of egress inter alia, yet these unhealthful conditions go uncorrected, teachers suffer asthma and other respiratory ailments, and the entire object is to get the teachers to quit (no possibility of a true acquittal or of a later special proceeding to vacate the penalty). One teacher was diagnosed with hypertension, diabetes, COPD which had never been the case previous to her stay at the rubber room. Other reassigned teachers simultaneously were also afflicted with acute bronchitis, and became severely ill for several months. In fact, a petition was signed by 10 teachers assigned to the 333 Rubber Room that listed their names, type

of respiratory illness as well as the dates and occurrences of these illnesses. Most tragic of all was the death of Gilda Teel, from Bronchial Pneumonia while she was at the rubber room and a T4A plaintiff. The depression Ms. Teel experienced for having been sent to the rubber room without cause, was clearly a significant contributing factor in her succumbing to respiratory illness that afflicted many teachers there. The status of reassigned teachers is lowered to below that of the lowest hourly employee. They are tainted for life within the DOE, and unless entirely exonerated of all charges called specifications (DOE attorneys convert the allegations of the Principal into as many specifications as possible from all the observation reports, letters, disciplinary meetings, follow-up letters to file and other documents, often drafted months after the fact and backdated). Thirty specifications, each with anywhere from 1-80 or more incidents are not uncommon, 10-15 specifications (each with many sub-specifications) are typical. There are even cases where more than 200 specifications each with sub-specifications have been heard. Yet there is virtually no chance for a teacher who has been charged with more than one or two specifications to be completely exonerated. Some specifications violate the Collective Bargaining Agreement ("CBA"), or conflict with one another, and it is up to defense Counsel to get these charges dismissed. With several hundred sub-specifications, and with the Department sustained by the Arbitrator if even one allegation is inadvertently omitted in the rebuttal, an arbitral award of discipline is the result. In incompetence cases, or where any observation report is part of the specifications DOE attorneys scour the observation reports for silent areas, then they cite the teacher for having failed to incorporate the element not mentioned in the report. When there is cross-examination, sometimes the evaluator is not even familiar with the technique or concept the teacher was cited for omitting in the specifications. When the witness is confronted with items of the specifications, the DOE attorney objects vociferously that specifications are legal constructs written by a lawyer and that the witness should not be questioned about them. The arbitrator usually agrees over the objections of NYSUT counsel's pleas that those are the allegations based on the specific report of that witness how can a witness have included something with which the witness is unfamiliar, the allegations must be questioned. In the case of T4A teachers they were all forced to go through the hearings without counsel as their lawyers were told to withdraw and the arbitrators granted all of their withdrawal.

IT IS TO BE UNDERSTOOD THAT THROUGHOUT THE ENTIRE CONFINEMENT TO THE RUBBER ROOM AND ALL ITS DEGRADATION, THROUGHOUT THE ENTIRE 3020-a PROCESS NO TEACHER HAS BEEN FOUND GUILTY OF ANYTHING WHATSOEVER YET.

Only after the Arbitrator renders a decision is there any judgment of any type then the teacher is disciplined -- even if the teacher was exonerated of 199 of 200 of the specifications and sub-specifications by an arbitrator who wants to remain an Arbitrator -- once the decisions if rendered the teacher is immediately removed from the payroll if terminated or suspended without pay, sometimes before the teacher even received the decision.

.   A tenured teacher who has even been mildly disciplined with a reprimand is thus guilty, the decision becomes public (albeit under FOIL @ $.25/page and decisions are typically 50-90 pages), all states exchange disciplinary information barring the teacher from future employment at any public school. That is how DOE coerces teachers to enter into a settlement agreement to resign, or to become an ATR without the "conviction" on their State Education Department record. While the DOE saves the cost of the Arbitration and the teacher is spared its ordeal, the DOE gains far more. It requires the withdrawal of all litigation claims until the date of the settlement agreement for the §3020 and it usually contains an automatic termination clause should the conduct ever be repeated. Thus, a teacher with a long commute was coerced into agreeing that if she ever exceeded a cumulative maximum of 55 minutes of tardiness in any academic year she would be automatically terminated without further due process. An outstanding teacher at NYC's premier High School who Mr. Brill calls "Patricia Adams" who was a recovering alcoholic signed a similar clause; her father was dying and she returned home to California for a few weeks, other family members drank heavily, she relapsed briefly, but not so briefly as to lose consciousness at a staff workshop with no students present, very shortly after she returned to NYC immediately after the burial, and the system lost an outstandingly talented teacher who had only once in 10 years been observed with any symptoms by a student. In another case, at the summer school of that same premier High School, a student attempted to extort a passing grade for her failing beau (both students enrolled at other schools during the regular school year) by threatening another outstanding teacher who taught summer school session there as well (open to all students from all schools, public or independent) that she would

claim the teacher had inappropriately touched her unless he passed the boy who was failing. After grades were distributed, she carried through with her threat. The teacher was coerced to resign; now every school district to which he applies inquires as to the circumstances surrounding his departure from his most recent position, and he has been out of work and denied unemployment benefits.

While Brandi Scheiner, a primary grade teacher for 24 years, who is loud, funny, round and cuddly and has been the perfect type of K-2 teacher and surrogate caretaker for students in transition from caretaker to school was written up in observation reports or specifications, or both, for poor "rug management." Apparently the observer was not entirely pleased with how Ms. Scheiner had arranged her students to be seated on the rug for "story time." If I had a child in kindergarten, I could not think of a story teller who would be more expressive in her ad-libs, more raucous in her characterizations, and make any child so eager to read the story for themselves, again and again remembering Scheiner's antics, that they could hardly contain themselves getting her help to read and relive any story by themselves. Ms. Scheiner was also cited for giving more glue, to a student who had gotten the glue on something other than his project, ergo he had misused the glue, and horrors she had given him more glue--she had also given the rest of the students more glue. At primary grade age, some students have better coordination than others -- it would have been poor pedagogical practice to have denied that one child more glue, and singled him out for no logical reason. These criticisms were not against Ms. Scheiner's teaching; they were against Ms. Scheiner personally for her extrovertive affect, and against her top of scale salary. Again and again I see these nonsensical specifications in 3020-a charges; never have I seen that a teacher taught substantively incorrect concepts, facts, and ideas. The most prevalent complaint is poor class management. When it is a favored teacher, the few students not excited about the class activity are ignored in the report unless they interfere with the lesson. When it is a disfavored teacher, that is all that the observer writes about. In one school (which is being phased out for poor student performance) an observation report indicated that the teacher did not (interrupt) to address a late comer on arrival, that few students handed in the homework, that one student was intermittently nibbling something from his pocket, and that not everyone handed in the "do now" (a five minute opening task while the teacher does attendance, distributes and collects papers, etc). This clearly could be said of every

classroom where only 29% of the males and 36% of the females assigned to the ninth grade, progress to tenth grade at the end of any given year (9th grade including both entering 9th graders and those who have already been in 9th grade for two or more years).

During a specific teacher's daily trudge to the "rubber room" at 333 7th Avenue from June 2006 until December 2008, she found that the demographics had changed considerably from what she understood them to be a decade earlier. Previously the mode reassigned teacher was a male younger than 50, being accused of an inappropriate relationship or inappropriate touching or comments with regard to his students. During the long confinement in the rubber room, it was filled almost exclusively with female teachers over 50 brought up on charges of incompetence after decades of competent service, or accused of the most trivial incidents of "non-misconduct" [e.g. a teacher donating two plants to his school without prior authorization (a Mr. Pakter who was hailed as teacher of the year under Mayor Giuliani, but who is now litigating for five years confinement in various rubber rooms), a teacher who was accused of submitting an unacceptable receipt for instructional supplies but who never cashed the check meant for the purpose (Ms. Teel whose death was likely caused by confinement to the rubber room and the outrage of with what she was charged), Mr. Pakter, for promising students the same gift they had been promised for 35 years, if they earned a grade point average of 90% or better on their report card) inter alia. ("Gifting" of students was suddenly not allowed when the school had instructions "get Pakter").

Finally, after almost three years of not being allowed to practice the profession which the DOE had found these teachers had satisfactorily performed for decades, to the daily humiliation of security guards overseeing the teachers sign in and out of the building to begin and end the day, at lunch break, and on two 10 minute breaks as if they were prisoners taking leave from their pods, to the congregating spot at the front of the 333 facade and for meals, the time for their hearings approached. The pervasive humiliation of the rubber room was intolerable; the rubber room to which they were assigned was intentionally depressing and hostile; had they left, each could have brought an action for Constructive Termination.

Because of the great pain and feeling of betrayal (or at least neglect) by the UFT for all of the above indignities that the tenured teachers felt their union, the UFT, should have prevented or corrected, by March 1, 2008, T4A enumerated 61 plaintiffs, in its Action brought in the

11

SDNY, and in the Second Amended Complaint of Teachers4Action v Bloomberg et al. 08 CV 0548 (VM)(AJP) (SDNY 2008) the UFT was added as co-defendant along with the Mayor and the DOE.  This was insisted upon by a few of the more militant plaintiffs.  The dispute with the union was over when many of the worst rubber room abuses were supposedly ended with an agreement between the DOE and the UFT, signed on June 27, 2008.  Between March 1, 2008 and June 27, 2008 none of the 61 plaintiffs, had union representation for their 3020-a hearings.  They could not afford to hire attorneys as rubber room teachers typically lose ~ $25,000.00 in "per session" or coaching, tutoring, night school, summer school and other extra session pay beyond their base pay, and are usually struggling to meet their expenses as they are only permitted their base pay when investigations or charges are pending.   There were several teachers required to go through the 3020-a process without counsel.  Stays were granted in Court but not for the full four months.  The teachers objected saying they had paid $1,000.00 a year for as many 35 or more years, and now when they needed the benefit of counsel that was included in their union dues--counsel had withdrawn.  Each teacher whose hearings were hurried by the DOE to be closed before the end of June was fired, typically less than 30% are fired but the vast majority get any where from a reprimand to a suspension (few weeks to one or more years).  The T4A teachers whose hearings did not begin or did not end until the fall resumed representation by union counsel.  None of them defended themselves pro se; they all said they needed counsel, could not proceed on their own, put on no witnesses, did not cross examine witnesses, said they were deprived of counsel, had no money for counsel--all were fired.  I am trying to get new 3020-a hearings for several so affected.  For the record T4A broke up because of differences in strategy among factions of plaintiff's; one group of plaintiffs refiled and their suit is active -- they paid costs because it is a court rule that if an action is withdrawn or dismissed without prejudice, then if the Plaintiffs refile, the Defendants should not have to pay to defend a second time.  Several of the interim Orders of several judges indicate that confinement for years to a rubber room that is admittedly a hostile work environment before a teacher has been found guilty of anything is a serious due process issue.  One last comment before closing is that classroom management for older teachers is an uphill battle because of the culture that the Chancellor has engendered.  The Chancellor and the Administrators, have bought into the new, fresh blood and therefore pass on to the students that it is okay to "dis" older teachers.  If the culture revered the older, wiser, more experienced teachers as it did 50 or 60 years ago, the Principals would make

this clear in their schools, the students would follow suit and the Principals would not have the older teachers as fodder for complaints that the older veteran teachers cannot keep the students toeing the line!

Disclosure: The author is a scientist [Ph.D. in Microbiology from Georgetown, M.A. in Biological Sciences from Stanford, A.B. in Zoology from Barnard; fellowship training at Harvard Medical School(Boston), National Institutes of Health (Bethesda), Karolinska Institute (Stockholm), Weizmann Inst. (Rehovot, Isr.), full Professorships at New York Medical College, Cornell-Weill Medical College numerous stringently peer-reviewed publications and NIH, NSF, American Heart Assn. Major Grants; Board Certified in Clinical Chemistry, Licensed as Clinical Laboratory Director in NY, NJ, FL, Editorial Board Member of Journal of Bacteriology, Federal Advisory Panels, *inter alia*]; Educator: began certified teaching at K-12 level in 1960 in California, was candidate for Ph.D. in Science Education at UC, Berkeley until switched to molecular biology as the more challenging training -- nevertheless attained 116 graduate semester hours in Education including School District Administrator's License in NY (while at Teachers College, Columbia University), hold valid permanent teaching licenses in Calif, NY, at all grades levels, and NJ in Biology]; Employed by Board of Higher Education 1996-1997 at Hunter College Campus High School and in the spirit of being a Civil Rights Activist in 1960's, by Board of Education in 1997-2008 at Lafayette High School, Brooklyn until 2000 (with rave reviews) and then at Brandeis High School 2000-2008. In 2004, the Principal appointed at Brandeis while I was on leave, did not want 65 year old, who transferred into the school on medical transfer in 2000 (guarantees placement in school closest to teacher's home), returning from medical leave during which earned J.D. with above additional credentials; the central office insisted that there was right of return from approved leave. The Principal and her subordinate Asst. Principals built a silly incompetence case over two years of making calamities of minutiae, exacerbated class management by Deans understanding that they should not assist, assigned self-contained special ed classes for entire program for an entire year when unlicensed in special ed-- non-compliant with State regulations; sent to 333 7th Avenue where I spent September 2006-June 2008. My problems there focused on the unsuccessful but relentless and illegal attempts to get rid of my service dog NICO (thus constructively terminate me as NICO charms and my legal skills ameliorated the hostile work environment at 333); the Arbitrator gave no mitigation to the

fact that I was purposely assigned Spec. Ed classes exclusively, etc. and terminated my employment.  I am the one teacher whom the UFT brought an age discrimination case in my behalf based on the EEOC investigation from 2005-2007.  It was settled through the mediation of the Chief Magistrate of the SDNY for a very sizable monetary settlement to me. Attorney: practice in employment, civil rights and other civil litigation  [J.D. Brooklyn Law School, Merit Scholarships based on rank in class, Editor of International Law Review, Admitted in NY, NJ, SDNY, EDNY, NJD, 2nd Circuit, and U.S. Supreme Court Bar].