*Joy Hochstadt, P.C.*
*Attorneys at Law*
*300 Central Park West*
*New York, New York 10024*

March 12, 2011

The Honorable Sandra L Townes
United States District Judge
Eastern District of New York
225 Cadman Plaza
Brooklyn, New York 111201

Re:  <u>Thomas et al v. NYC Dep't. of Education, et al.,</u>
Civil Action No. 09 cv 5167 (SLT)(RAM);
Request to submit supplementary brief opposing Motion to Dismiss

Dear Judge Townes:

I am the Counsel to the putative plaintiff class in the above action.

Over eight months have transpired since I opposed Defense Motion to Dismiss.  In the interim I have had many opportunities to discover facts by learning the disposition of the approximately 1/3 of the putative class[1] who had been removed from their classrooms and were awaiting Ed. L. 3020-a charges being filed or having received such charges were warehoused in TRC's or "rubber rooms" either awaiting charges, or awaiting their hearings, or awaiting the arbitral decision at the time that this action was filed.

I have also served as Respondent's Counsel in SED. File No. 16,739, and I have thereby become more familiar with the Ed. L 3020-a hearing process than previously as either respondent or observer of proceedings open to the public.

In this time period, I have also become more practiced in the law relating to equal protection and the nuanced opinions of what rational bases have been accepted, and which ones have not.  Despite the high bar that a challenger must make to show that the classification has not rational basis, it cannot be made in bad faith, has no legitimacy, or is a pretext for some other goal that an entity acting under "color of state law" is unwilling to bring into the public debate or to legislative action, and therefore has no ***legitimate rational basis.***

From the time I became a student of the law, I have heard about those proverbial "slippery slopes" but it did not have a true understanding until I found myself in the midst of **no less than the *de facto* covert piecemeal total dismantling of teacher tenure for New York City Teachers and this is not future tenure for new hires but the abrogation of this property right for presently tenured educators**.  This was accomplished not by public debate and legislation, not by union contract ratified by the membership (as was done with Principals in trade for other concessions), not by City Council ordinance enactment, but by a combination of numerous specific steps many of which are the core complaints in this action.  Most invidious is that those steps involve defamation, perjury, subornation of perjury, and adoption of an arbitrator

---

[1] It is about a third not because the other two thirds were treated differently but because as a snapshot in time the other two-thirds were earlier or later in the putative class period than the time frame in which the complaint was filed.

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,   Telephone  212 580 9930     Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court       e-mail  joy.hochstadt.pc@gmail.com**

selection process by which hearing officers are no longer independent but specifically selected to terminate good teachers' careers. The entire Ed. L. 3020-a disciplinary process for tenured teachers in NYC has been purposefully developed over the past decade not to discipline errant tenured teachers and administrators, but that so the facade of tenure remained in place, while any Principal could fire any tenured teacher at will, and not have to hire any tenured teacher excessed from another facility which had closed or had different needs based on changing demographics of its student body. Said Principal preferring to hire untenured, lower costing, younger applicants. Since excessing is no longer accomplished by reverse seniority, but by subjective Principal deslection, teachers excessed from their schools are "untouchables" and join the burgeoning Absent Teacher Reserve ("ATR") pool which the former Chancellor ever presses to terminate or at least lay off.

The steps were as follows:

#1. 2000 Change in Ed L. 3020 which the UFT was coerced to support (see last 2 paragraphs of Dkt # 61-3), in which all that is specified in the amendment to Ed. L. 3020 is that if a provision of the Collective Bargaining Agreement ("CBA") in NYC only, is in conflict with Ed. L. 3020-a, then the CBA supercedes.

    a. Already slated to go into the CBA at the time the above amendment was adopted without hearings or debate, was the change from American Arbitration Association ("AAA") offering panels of 15 qualified labor arbitrators to both Complainant and Respondent from which they jointly would select an *ad hoc* arbitrator for that proceeding, (who was severely limited in the number of proceedings under Ed. L. 3020-a the arbitrator could preside, over a several year time frame for a given School District), to a permanent arbitrator panel.

    b. Without specification to the legislature that this is what would be in the CBA, and having already agreed to certain CBA provisions, that the UFT wanted, needed and fought hard to obtain, the DOE stated that "the procedures negotiated by the parties for class size and organizational grievances shall not be implemented until the above amendment to Section 3020 of the Educational Law is enacted." (Last sentence Dkt #61-3).

    c. What was then specified in the CBA was a "rotational panel and attorney teams," which would serve together for four cases (the maximum permitted by Ed. L. 3020-a during a two year period). In fact, the last time there was any rotation in NYC was in 2005. Arbitrators on the NYC panel were required to agree to preside for 54 days per annum until September, 2010 and thereafter for at least 74 days per annum.[2]

    d. The "rotation" of the panel is as follows: at the time the new provision was enacted there were then a number of arbitrators who were already regularly employed at AAA rates (allowed for AAA *ad hoc* arbitrators per 3020-a but many times the rate allowed for permanent arbitrators per Ed. L. 3020-a). Arthur Riegel who had been a NYC school Principal for several decades, attended law school (perhaps at night, the school he attended has a large night division) while he was employed by the BOE, Eleanor E. Glanstein, a well-established pro-employer labor arbitrator, Jack Tillum, Eric Lawson, Earl Pfeffer, Paul Zonderman, Stuart Bauchner, Howard Edelman, Martin Schulman, *inter alia.* Their arbitral styles and temperaments were known. However, the *ultra vires* act that was not authorized by either statute or CBA, was that the permanent panel arbitrators would be paid AAA level fees, not permanent panel fees limited by Public Law to $200.00/per day.

---

[2] The Ed. L. 3020-a for *ad hoc* arbitrators, selected by both parties, and limitation of the extent of involvement with any school district, was to ensure the independence of the arbitrator, by preventing the arbitrator from earning sufficient income from any school district, that said income could be a determining factor in the outcome of any case.

e. The three-arbitrator panel where incompetence was an issue was eliminated without mention in the CBA while retained in the rest of the state (as it is easier to omit consideration of testimony, or find trivial or contradicted charges sustained when writing a report solo than when as part of a triumvirate, where one member is the respondent's advocate).

f. Thereafter, new panel additions appeared to be empaneled fairly, except for the fact that all orientation and all work was and is performed in DOE premises, with DOE prosecutors regularly involved in *ex parte* communication, indoctrination of panel members as to how things have "always" been done (sidebars off the record, discovery demands approved but never compelled and without consequences for non-compliance).

g. After each year, renewal of each panel member for the following year's panel was indicated by each side. When the UFT wanted not to renew Glanstein because her rate of terminations was more than double any of the other arbitrators, the DOE offered the UFT an additional seat on the Collective Bargaining Committee ("CBC") for as long as Glanstein continued to serve as arbitrator. Whether or not such a trade violates the fair representation requirement of the NLRA—in offering it, as a bribe to keep a biased arbitrator, it is a bad faith illegitimate act in violation of equal protection under the law to those over whose cases she presides,[3] when offered as a solution by the DOE, a government agency mandated to provide due process and equal protection.

h. When there was an arbitrator, Douglas J. Bantle, whom the DOE could not tolerate, however, because he dismissed all the fabricated, trivial and ludicrous charges against educators, the DOE did not renew him and allowed the UFT to deselect another arbitrator, in tandem. Glanstein would have cost the extra seat on the CBC, thus Andree McKissick was chosen to go off the panel by the UFT.[4]

---

[3] It has also been alleged that Theresa Europe, the chief prosecutor for DOE, rather than Deborah Marriott, who heads the Teacher Tenure Hearing Unit for NYSED, assigns prosecutors to individual cases; this allegation must be explored in Discovery since if the complainant selects which arbitrator on a permanent panel is assigned which case then all vestiges of due process are gone, as the assignments would be made on the basis of which employees were most unwanted going to the harshest arbitrator. What is definitely known is that NYSED allows DOE to use NYSED letterhead to generate charges brought under Ed. L. 3020-a, because NYSED's letters all begin, "Your school board has preferred charges against you." Said charges were brought in accordance with Ed. L. 3020-a provisions. Since NYSED's form letters, did not say "Your Principal . . . " or even "Your School District Superintendent . . " DOE only generated form letters with NYSED's letterhead name and address, returnable to NYSED but originating on Chambers Street, NYC yet purported to be coming from Albany.

[4] Each of Bantle and McKissick had cases assigned to them over which they were to continue to preside when they were informed they would not be included on the panel for the following year. It was well-known that McKissick was accused of *ex parte* stating that she planned to be harsh with <u>Teachers4Action et al v. Bloomberg et al</u> 08-cv-0548 (VM)(AJP) SDNY in an affidavit filed by one of the plaintiffs who overheard the *ex parte* discussion with Theresa Europe. That Plaintiff, Twana Adams was also to have her case heard by McKissick who knew she had not been renewed, and knew that Adams had filed the affidavit. When Adams' Counsel moved for McKissick to recuse herself, McKissick refused and fined Adams 1/3 of her take-home pay for an entire school year, for a ministerial error on an injury report that McKissick called inadvertent, and said was mitigated by the fact that Adams was in great pain from the injury and medicated. It was the animus of Adams' Principal who called the error a "forgery". Adams was made into an ATR and sent to work in a suspended-student facility. The laws that are being challenged herein have allowed the wholesale deprecation of outstanding educators (Adams' awards and fellowship all for excellence of teaching are undisputed). Had AAA rules remained in effect there is no question the AAA committee on recusal would have recused McKissick. But moreover, if it were not for the DOE's insistence on replacing Bantle, McKissick would still be there, as she is precisely the type of hearing officer that the DOE has been selecting for and approving the work of, for the last eleven years, with the panel becoming evermore pro-DOE, as the hearing officers that the DOE wants to keep are kept

      i. The DOE makes very clear that it expects hearing officers to fire the educators who are brought up on charges and will be able to retain their hearing officer position if they do so, as Glanstein did. *Cf.* Items g, and, h. above.

      j. Thus, concomitant to the change from *ad hoc* arbitrators with severe limits on the number of cases they can preside over, and AAA rules and oversight, to a permanent panel with DOE "rules" of extremely well-paid hearing officers, now required to work for the DOE at least 74 days per annum (and the discussion about how many days the arbitrator had to make up and to whom and when she would submit her invoice was all to the DOE prosecutor, whom to the arbitrator was the "arbitrator's employer," in my presence), means that with hourly billings for off-site research, preparation and drafting, billed to the DOE, as well as travel and local subsistence, the arbitrators are earning $150,000.00 to $200,000.00 per annum for easy work administering a single law for less than 1/3 full-time effort (and with no overhead costs).

#2. ca. 2003 Principals gave up their own tenure for significantly higher pay, incentive bonuses and the ability to completely control hiring and retention of teachers in their buildings, with any fines or savings gained from reassigned, terminated or suspended teachers returned to the school for the Principal's disposition.

# 3. ca. 2003 With principals able to excess teachers not wanted in the school and bring up on 3020-a charges (those not wanted in shortage areas where there are vacancies), an ATR pool grows simultaneously to active recruitment of non-pedagogues into the teaching profession via the Teaching Fellows Program. The Fellows chosen are young with successful business experience in the private sector and have a minimum 3.0 GPA as an undergraduate (with strong preference for prestigious undergraduate institutions). The Fellows shall receive a paid-for by DOE Master's degree in curricula aimed at success in meeting the standards of No Child Left Behind legislation.

#4. 2004 A manual ***How to Fire Tenured Teachers*** is distributed to all Principals. Giving examples, sample letters, keeping observations totally narrative and subjective. See Exhibits 1-9 excerpted from the manual. What is specifically left out of the manual and unwritten but taught verbally is the advice of the Regional and Administrative Trials Unit Counsel on how to write up everything the Principal can criticize in an unwanted educator. [What counsel lawfully should be advising instead, is that all pedagogical staff must be treated with the same even-handed criticism and support, and uniform discipline for the same "infractions"].

# 5. 2005 Seniority-transfers ended; all vacancies are to be filled by principal approval after interviews, even hardship and medical transfers require principal approval.

# 6. ca. 2005 The Leadership Academy is launched. It is a one-year training program to train 50 new Principals per year on the "Business Model." Most enrollees are young, non-educators trained in "bottom-line, goal-oriented objectives to raise standardized scores and rid schools of what they are taught at the academy is "deadwood" by methods exemplified in item #4. above and exhibits 1-9 and in practice means any teacher who they dislike, or whose positive qualities threaten their insecurities and incipient skill-set for their new position).

# 7. Throughout the period ca. 2003 to the present, schools are closed and reopened again with new "business plans" and especially new staff. The prior staff not selected for the reorganized school become ATRs. (See Exhibit 10 Letter to the Editor of the ***Wall Street Journal on ATRs.***

---

by offering the UFT some other type of concession that does not interfere with the ability of the DOE to fire any tenured teacher it wishes and make ATRs of the rest with the intention of firing them soon enough.

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,   Telephone  212 580 9930   Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court       e-mail  joy.hochstadt.pc@gmail.com**

#8.  ca. 2005 or earlier Principals are made responsible for their entire budget including dollar amounts for pedagogical staff salaries.  Previously schools were allotted teacher lines by license or subject area, but where on the salary schedule each teacher fell as to longevity increments and educational attainment differentials did not impact the school budget (in fact districts formerly prided themselves on having the highest salaries reflecting retaining the most experienced and educated teacher-workforce).  With this change Principals stopped hiring veteran teachers preferring educators earning half as much so that two could be hired in place of one.[5]

#9.  It is finally proposed that the DOE lay off 6400 teachers, not by reverse seniority with tenured teachers only being laid off after all the untenured teachers in that license area laid off first, but by Principal evaluation, purposely kept totally subjective to fulfill the contract with the Principals that they alone would be held responsible for the performance in their buildings and would not be able to blame anyone because they could hire or fire any licensed teacher at will.

The above chronology, if item #9 is implemented, will be the final step to converting a tenure system to an at-will employment situation and stealing the asset of tenure, a state-granted property interest in life employment by subterfuge, differential treatment of individuals simply not liked by their Principals, wrongful defamation, and unfounded charges, all by subjective Principal evaluation.

What has been kept even quieter than rubber rooms, biased arbitrators, and orchestrated disciplinary charges, is that the experiment has not worked.  The Bloomberg-Klein concept of how to run the schools has been as much of a "dud" as those Soviet five-year economic plans.  Student benchmarks have not really improved and they have declined if the inflated scores in the schools where the Principals have been quietly removed for "scrubbing" the test scores (fraudulently changing them to appear better than they actually are), marking absent students present (to maintain capitation funding allocations, as well as bolster one of the benchmarks for Principal bonuses), etc. are removed from the composite analysis.

This action was brought because most of the teachers reassigned and disciplined so as to terminate or virtually terminate their teaching careers by being made into ATRs, and now threatened with "lay-off"–i.e. termination as there are no plans that they will ever be recalled, did nothing to deserve the discipline. Whereas at the beginning of the prior decade, the 3020-a termination rate was less than 30% ***and*** only a very small percentage of the number of educators being brought up on charges today were then brought up on 3020-a charges; it has more than doubled over the decade both by an evolving permanent panel, and panel members being influenced further, by both the public message from the DOE and the tenor of the public debate  .

In a little over a decade the DOE has been able to remove from regular classrooms probably over 3000 tenured teachers, with subjective, erroneous and bad faith motivation, whereas probably 10% of those deserved discipline (the same absolute number as in 2000).  DOE, now plans are to remove in one action probably the same number again of long-tenured teachers–with out any objective instrument to measure quality.

---

[5] In November 2008, an agreement was reached between the UFT and the DOE to prefentially hire ATRs giving financial incentives to schools utilizing these talented teachers.  It lasted until December 2010 and prevented the UFT from suing the DOE.  However, it too, was "window dressing" and never implemented, because if it was I would have not gotten calls from ATRs all during 2009 and 2010 complaining that hiring halls and fairs are being conducted to place teachers –ATRs not invited!  The UFT apparently is more interested in announcing forward looking agreements that will get its leadership re-elected that in demonstrating proven accomplishments, i.e. it goes along with the facade that it has power to serve its membership, when it does not.

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,   Telephone  212 580 9930    Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court        e-mail  joy.hochstadt.pc@gmail.com**

I therefore respectfully request to submit a supplementary brief which discusses and documents these facts and discusses them in light of equal protection challenges such as Lawrence v. Texas, 539 U.S. 558 (2003), Romer v. Evans, 517 U.S. 620 (1996) Heller v. Doe, 509 U.S. 312 (1993); Gregory v. Ashcroft, 501 U.S. 452 (1991); Plyler v. Doe, 457 U.S. 202 (1982), Vance v. Bradley, 440 U.S. 93, (1979).  Equal Protection is not even debatable when it was done for improper motives, as a pretext to accomplish another goal that could not be accomplished through the democratic legislative process.

The proof is that one year ago the DOE announced it needed to lay off an equally large number of teachers, also by laying off the "rubber room," ATRs, "U" rated and other disfavored teachers first, rather than be reverse seniority.  The Mayor dccided not to attempt it.  There was no lay-off.  I posit that again this year if the DOE is not permitted to lay-off the teachers that are disfavored there will be no lay-off.  Therefore, a lay off is not needed, it is a pretext to use the prevailing economic conditions to get rid of tenured educators, solely unpopular with their principals by the thousands rather than merely by the hundreds each year, that we allege is in wilful destruction to the tenured educators' property rights and unlawful.

I seek to update this motion so that both the DOE and the plaintiffs can supplement their briefs, while respectfully requesting that the Court then rule with reasonable alacrity so as to move on to discovery of the mechanisms and motives that have led to this dismantling, before the final step #9 becomes effective and then seek the other relief needed sooner rather than later.  Said relief requires the development of objective evaluation of teachers that measure the same parameters for each educator's observation in a given course or class, that precede any possible adverse action.

I propose to file my supplementary brief by April 11, and allow Mr. Leighton the same four weeks.  I further request that for the purposes of this supplement, that the Defendants merely supply no later April 1, the number of educators currently removed from regular duties and reassigned; all the locations by street address of their current assignments; the number of educators currently charged under Ed. L. 3020-a who were served charges prior to June 30, 2010 still without dispositions; the number of educators served with said charges since July 1, 2010; the percentage of  reassigned cases resulting in retirement, resignation, or termination for the years commencing July 1, 2008, July 1, 2009, July 1, 2010 to the present; the number of arbitrators presently employed; the Stay in place, for full discovery, not withstanding.

        Respectfully submitted,

*[signature: Joy Hochstadt]*

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,     Telephone  212 580 9930     Facsimile: 212 580 9322
Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court     e-mail  joy.hochstadt.pc@gmail.com**